

JS 44 (Rev. 07/16)

**CIVIL COVER SHEET**

17-cv-402

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
David Bakos, et al.

**(b)** County of Residence of First Listed Plaintiff   Various
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Alan B. Epstein, Esq., Spector Gadon & Rosen, PC
1635 Market Street, 7th Fl., Philadelphia, PA 19103
215.241.8888

**DEFENDANTS**
American Airlines, Inc. and Allied Pilots Association

County of Residence of First Listed Defendant   Tarrant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1 U.S. Government
    Plaintiff

☐ 2 U.S. Government
    Defendant

☒ 3 Federal Question
    *(U.S. Government Not a Party)*

☐ 4 Diversity
    *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff*
*and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product |   Product Liability | |   28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument |   Liability | ☐ 367 Health Care/ | | | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & |   Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
|   & Enforcement of Judgment |   Slander |   Personal Injury | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' |   Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted |   Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and |
|   Student Loans | ☐ 340 Marine |   Injury Product | | |   Corrupt Organizations |
|   (Excludes Veterans) | ☐ 345 Marine Product |   Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment |   Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
|   of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud |   Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) |   Exchange |
| ☐ 190 Other Contract |   Product Liability | ☐ 380 Other Personal |   Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal |   Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise |   Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | ☐ 362 Personal Injury - |   Product Liability |   Leave Act | | ☐ 895 Freedom of Information |
| |   Medical Malpractice | | ☐ 790 Other Labor Litigation | |   Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** |   Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 899 Administrative Procedure |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | |   or Defendant) |   Act/Review or Appeal of |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party |   Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ |   Sentence | |   26 USC 7609 | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability |   Accommodations | ☐ 530 General | | |   State Statutes |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| |   Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| |   Other | ☐ 550 Civil Rights |   Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | |   Conditions of | | | |
| | |   Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original
    Proceeding

☐ 2 Removed from
    State Court

☐ 3 Remanded from
    Appellate Court

☐ 4 Reinstated or
    Reopened

☐ 5 Transferred from
    Another District
    *(specify)*

☐ 6 Multidistrict
    Litigation -
    Transfer

☐ 8 Multidistrict
    Litigation -
    Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
49 U.S.C. Sec. 42112
Brief description of cause:
McCaskill-Bond Act

**VII. REQUESTED IN
COMPLAINT:**
☒ CHECK IF THIS IS A CLASS ACTION
    UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

**VIII. RELATED CASE(S)
IF ANY**
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE
01/27/2017

SIGNATURE OF ATTORNEY OF RECORD
/s/Alan B. Epstein

JAN 27 2017

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____



**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA -- DESIGNATION FORM** to be used by counsel to indicate the
category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff:  Various

**17    0402**

Address of Defendant:  4255 Amon Carter Blvd, Fort Worth, TX 76155
14600 Trinity Blvd., Ste. 500, Fort Worth, TX 76155

Place of Accident, Incident or Transaction:  n/a

Does this case have multidistrict litigation possibilities?                               Yes ☐    No ☒

*RELATED CASE IF ANY*

Case Number:                          Judge                          Date Terminated

Civil cases are deemed related when yes is answered to any of the following questions:
1.  Is this case related to property included in an earlier numbered suit pending or within
one year previously terminated action in this court:                          Yes ☐    No ☒

2.  Does this case involve the same issue of fact or grow out of the same transaction
as a prior suit pending or within one year previously terminated action in this
court?                                                              Yes ☐    No ☒

3.  Does this case involve the validity or infringement of a patent already in suit or
any earlier numbered case pending or within one year previously terminated action
in this court?                                                        Yes ☐    No ☒

CIVIL: (Place in *ONE CATEGORY ONLY*)

A. *Federal Question Cases:*
1. ☐ Indemnity Contract, Marine Contract, and All Other
Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☒ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
(please specify) 7 U.S.C. Section 499(a)

B. *Diversity Jurisdiction Cases:*
1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability - Asbestos
9. ☐ All other Diversity Cases
(Please specify)

ARBITRATION CERTIFICATION
*(Check appropriate Category)*

I, Alan B. Epstein, Esquire, do hereby certify:

☒    Pursuant to Local Civil Rule 8, Section 4(a)(2), that, to the best of my knowledge and belief, the damages
recoverable in this civil action case exceed the sum of $150,000 exclusive of interest and cost;

☒    Relief other than monetary damages is sought.

Date: January 27, 2017                          /s/ Alan B. Epstein
Alan B. Epstein, Esquire
NOTE:  A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except
as noted above.

Date: January 27, 2017                          /s/ Alan B. Epstein
Alan B. Epstein, Esquire

JAN 27 2017



### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA
### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| David Bakos, et al. | : | CIVIL ACTION |
| | : | **17    0402** |
| v. | : | |
| | : | No. |
| American Airlines, Inc. and | : | |
| Allied Pilots Association | : | |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a)    Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.    ( )

(b)    Social Security – Cases requesting review of a decision of the Secretary of
Health and Human Services denying plaintiff Social Security Benefits.    ( )

(c)    Arbitration – Cases required to be designated for arbitration under Local
Civil Rule 53.2.    ( )

(d)    Asbestos – Cases involving claims for personal injury or property damage
From exposure to asbestos.    ( )

(e)    Special Management – Cases that do not fall into tracks (a) through (d) that
Are commonly referred to as complex and that need special or intense management
by the court. (See reverse side of this form for a detailed explanation of special
management cases.)    ( )

(f)    Standard Management – Cases that do not fall into any one of the other
tracks.    (X)

| | | |
|---|---|---|
| 01/27/2017 | Alan B. Epstein, Esquire | /s/ Alan B. Epstein |
| Date | Attorney-at-law | Attorney for Plaintiff |
| | | |
| 215/241-8832 | 215/214-8844 | aepstein@lawsgr.com |
| Telephone | FAX Number | E-Mail Address |

(Civ. 660) 10/02

JAN 27 2017





## IN THE UNITED STATE DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| David Bakos, Richard Bell, Robert Benjamin, Terry Brooks, Brian Cameron, David Cooper, David Crowe, Greg Finch, Patrick Foley, Dewey Gray, Francis Heid, Kelli Hughes, Glenn Kyrk, Murray Muzzall, Mark Newcomb, Michael O'Bryan, Thomas O'Conner, William Payne, Michael Phelan, Cheryl Robles, Stephen Rogers, David Shaskan, Whitney Sieben, Gilberto Smith, William Tally, Scott Torrence and David Wexhler *Individually and on behalf of a class of similarly situated American Airlines Pilots,* <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN AIRLINES, INC. <br><br> and <br><br> ALLIED PILOTS ASSOCIATION <br><br> Defendants. | **17    0402** <br><br> **Civil Action** |

## CLASS ACTION COMPLAINT
## [Jury Trial Demanded]

Plaintiffs  David Bakos, Richard Bell, Robert Benjamin, Terry Brooks, Brian Cameron,

David Cooper, David Crowe, Greg Finch, Patrick Foley, Dewey Gray, Francis Heid, Kelli

Hughes, Glenn Kyrk, Murray Muzzall, Mark Newcomb, Michael O'Bryan, Thomas O'Conner,

William Payne, Michael Phelan, Cheryl Robles, Stephen Rogers, David Shaskan, Whitney

Sieben, Gilberto Smith, William Tally, Scott Torrence and David Wexhler, individually and as

members of a class of all similarly situated pilots employed by American Airlines before the

1

issuance of an unconfirmed September 6, 2016 arbitration award (the "Award") and the attached

Integrated Seniority List, bring this action against Allied Pilots Association ("APA"), and

American Airlines, Inc. ("American Airlines") for declaratory and injunctive relief to halt

implementation of the Award, to vacate or reform the seniority list that accompanied the Award,

and for redress, including the award of compensatory and punitive damages, for the failure of the

APA, in collusion with American Airlines to fairly and adequately represent the named and

unnamed Plaintiffs with regard to the seniority integration process affected under the McCaskill-

Bond Act (McCaskill-Bond"), 49 U.S.C. §42112 that arose as a result the merger of American

Airlines and US Airway, Inc. ("US Airways") consummated on December 9, 2013 and in

support of their claims, state as follows:

## NATURE OF THE ACTION

1.      Among all of the labor issues relating to the employment of pilots in the

commercial airline industry, the most important and most sensitive is pilot seniority.

2.      Higher placement on a pilot seniority list means better wages and working

conditions access to promotions, as well as quality of life issues such as the pilots choice of

schedules and routes, the type of aircraft to be flown and rank within a given crew. Pilots on the

lower end of a seniority list are also far more susceptible to possible career ending furloughs.

3.      In light of the dire consequences of the unfair and inequitable seniority list

composed by the Board of Arbitration convened pursuant to the provisions of McCaskill-Bond,

the named Plaintiffs, individually and collectively on behalf of their pilot counterparts who are

similarly situated, bring this action for declaratory and injunctive relief to: (a) vacate the Award

issued on September 6, 2016 by a Board of Arbitration (the "Arbitration Board"), comprised of

arbitrators Dana E. Eichen, Ira Jaffe and M. David Vaughn; (b) halt any implementation of the

2

Award issued by the Arbitration Board; (c)  vacate or reform the Integrated Seniority List

("ISL") issued in conjunction with the Award; and (d) redress wrongs, including the award of

compensatory and punitive damages, for the violations of McCaskill-Bond and for the failure of

the APA, in collusion with American Airlines to fairly and adequately protect the named and

unnamed Plaintiffs with regard to the seniority integration process (affected under the

McCaskill-Bond) that arose from the merger of American Airlines and US Airways.

4.    Moreover, prior to the effective date of the merger, and solely in its own self-

interest to swell its dues paying ranks and with the knowledge that it would petition to become

the sole representative of large groups of pilots with widely divergent interests, the APA agreed

to the terms of a binding agreement that it knew or should have known would have (and

eventually did have) serious deleterious effects on the American Airline pilots it then alone

represented.  Rather than zealously represent the legacy American Airline pilots who were its

members before the merger and before it petitioned to enlarge its representation to include the

pilots flying for US Airways, the APA, in concert with American Airlines and in the selfish

interests of those entities, unfairly, inequitably and in derogation of the duty of fair

representation, put itself in a position where it could not possibly provide fair representation.

5.    Specifically, Defendants have before, during and after the arbitration process

intentionally, recklessly and negligently denied to the named Plaintiffs and the legacy American

Airlines pilot class they represent the right to a fair and equitable integration of seniority with

pilots formerly employed by US Airways that will cause immediate and irreparable harm if the

Award and the attached ISL are permitted to be implemented, thereby subjecting each of the

named Plaintiffs and the class of legacy American Airlines pilots they represent to, *inter alia*: the

3

arbitrary and capricious downgrading of their proper positions on an integrated seniority list; the denial of career expectations; and the harmful impact of the increased risk of furlough.

6.      In the alternative to the requested action under McCaskill-Bond, Plaintiffs assert that the APA, in collusion with American Airlines, violated the duty of fair representation pursuant to the provisions of the Railway Labor Act, 45 U.S.C. §151, *et seq.* in recklessly integrating pilot seniority with pilots previously employed by US Airwaysways with the named Plaintiffs and the pilot class that they represent.

7.      The vindication of the rights of all legacy American Airlines pilots is both urgent and imperative since virtually all aspects of any airline pilot's employment rights and entitlements are based upon a seniority system, including, but not limited to, salary, benefits, promotions, equipment preference, flight route preference, geographic "home base" preference, monthly flight schedules, vacation preference, and retirement and pension rights.

8.      As a direct result of the arbitrary and capricious ISL affected as a result of the improper actions of the Defendants, the implementation of the Award and the attached ISL if not immediately halted and, in turn, vacated, will result in Plaintiffs being caused immediate, irreparable and severe harm that will follow them throughout their careers as airline pilots and thereafter in retirement, harm that cannot be fully and adequately compensated by money damages.

## THE PARTIES

### The Plaintiffs

9.      Plaintiff David Bakos is a United States citizen, residing in Thousand Oaks, California and is an experienced airline pilot holding the rank of Group 2 Captain. Plaintiff Bakos currently flies out of the American Airlines hub at the Los Angeles International Airport

4

in Los Angeles California. Captain Bakos was first hired as a pilot by American Airlines on March 11, 1992.

10.    Plaintiff Richard Bell is a United States citizen, residing in The Woodlands, Texas and is an experienced airline pilot holding the rank of Group 4 First Officer. Plaintiff Bell currently flies out of the American Airlines hub at the Dallas/Fort Worth International Airport in Fort Worth, Texas. First Officer Bell was first hired as a pilot by American Airlines on January 22, 1990.

11.    Plaintiff Robert Benjamin is a United States citizen, residing in Gallatin, Tennessee and is an experienced airline pilot holding the rank of Group 2 First Officer. Plaintiff Benjamin currently flies out of the American Airlines hub at the Miami International Airport in Miami, Florida. First Officer Benjamin was first hired as a pilot by American Airlines on August 6, 2001.

12.    Plaintiff Terry Brooks is a United States citizen, residing in Palm City, Florida and is an experienced airline pilot holding the rank of Group 3 First Officer. Plaintiff Brooks currently flies out of the American Airlines hub at the Miami International Airport in Miami, Florida. First Officer Brooks was first hired as a pilot by American Airlines on January 8, 2001.

13.    Plaintiff Brian Cameron is a United States citizen, residing in Santa Rosa, California and is an experienced airline pilot holding the rank of Group 2 Captain. Plaintiff Cameron currently flies out of the American Airlines hub at the Los Angeles International Airport in Los Angeles California. Captain Cameron was first hired as a pilot by American Airlines on October 22, 1992.

14.    Plaintiff David Cooper is a United States citizen, residing in Ft. Lauderdale, Florida and is an experienced airline pilot holding the rank of Group 3 First Officer. Plaintiff

Cooper currently flies out of the American Airlines hub at the Miami International Airport in

Miami, Florida. First Officer Cooper was first hired as a pilot by American Airlines on May 21,

2001. Following his furlough imposed by American Airlines before the merger with US

Airways, Plaintiff Cooper served in the United States military. Thereafter, Plaintiff Cooper was

recalled to active service with American Airlines, accepted reinstatement, continued to serve in

the military and promptly applied for, and was thereafter classified as being on, a Military Leave

of Absence ("MLOA") by American Airlines until that military service concluded prior to

December 13, 2013 when he again became actively employed as a pilot by American Airlines.

Plaintiff Cooper was not permitted credit for his time spent on military leave in the establishment

of the Integrated Seniority List issued by the McCaskill-Bond Board of Arbitration on September

6, 2016.

      15.    Plaintiff David Crowe is a United States citizen, residing in Weston, Florida

and is an experienced airline pilot holding the rank of Group 2 First Officer. Plaintiff Crowe

currently flies out of the American Airlines hub at the Miami International Airport in Miami,

Florida. First Officer Crowe was first hired as a pilot by American Airlines on April 9, 2001.

      16.    Plaintiff Greg Finch is a United States citizen, residing in San Diego, California

and is an experienced airline pilot holding the rank of Group 4 First Officer. Plaintiff Finch

currently flies out of the American Airlines hub at the Los Angeles International Airport in Los

Angeles California. First Officer Finch was first hired as a pilot by American Airlines on August

16, 1999.

      17.    Plaintiff Patrick Foley is a United States citizen, residing in Corpus Christie,

Texas and is an experienced airline pilot holding the rank of Group 2 First Officer. Plaintiff

Foley currently flies out of the American Airlines hub at the Dallas/Fort Worth International

Airport in Fort Worth, Texas.  First Officer Foley was first hired as a pilot by American Airlines on June 4, 2001.

18.    Plaintiff Dewey Gray is a United States citizen, residing in Las Vegas, Nevada and is an experienced airline pilot holding the rank of Group 4 First Officer.  Plaintiff Gray currently flies out of the American Airlines hub at the Miami International Airport in Miami, Florida.  First Officer Gray was first hired as a pilot by American Airlines on August 21, 2000. Following his furlough imposed by American Airlines before the merger with US Airwaysways, Plaintiff Gray served in the United States military.  Thereafter, Plaintiff Gray was recalled to active service with American Airlines, accepted reinstatement, continued to serve in the military and promptly applied for, and was thereafter classified as being on, a Military Leave of Absence ("MLOA") by American Airlines until that military service concluded prior to December 13, 2013 when he again became actively employed as a pilot by American Airlines.  Plaintiff Gray was not permitted credit for his time spent on military leave in the establishment of the Integrated Seniority List issued by the McCaskill-Bond Board of Arbitration on September 6, 2016.

19.    Plaintiff Francis Heid is a United States citizen, residing in Lewes, Delaware and is an experienced airline pilot holding the rank of Group 2 First Officer.  Plaintiff Heid currently flies out of the American Airlines hub at the Ronald Reagan Washington National Airport in Arlington County, Virginia.  First Officer Heid was first hired as a pilot by American Airlines on April 24, 1999.

20.    Plaintiff Kelli Hughes is a United States citizen, residing in Trophy Club, Texas and is an experienced airline pilot holding the rank of Group 3 Captain.  Plaintiff Hughes currently flies out of the American Airlines hub at the Dallas/Fort Worth International Airport in

7

Fort Worth, Texas. Captain Hughs was first hired as a pilot by American Airlines on February 8, 1989.

21.     Plaintiff Glenn Kyrk is a United States citizen, residing in Saginaw, Texas and is an experienced airline pilot holding the rank of Group 2 First Officer. Plaintiff Kyrk currently flies out of the American Airlines hub at the Dallas/Fort Worth International Airport in Fort Worth, Texas. First Officer Kyrk was first hired as a pilot by American Airlines on August 20, 2001.

22.     Plaintiff Murray Muzzall is a United States citizen, residing in Palmdale, California and is an experienced airline pilot holding the rank of Group 2 First Officer. Plaintiff Muzzall currently flies out of the American Airlines hub at the Los Angeles International Airport in Los Angeles California. First Officer Muzzall was first hired as a pilot by American Airlines on June 1, 2000.

23.     Plaintiff Mark Newcomb is a United States citizen, residing in Valley Center, California and is an experienced airline pilot holding the rank of Group 2 First Officer. Plaintiff Newcomb currently flies out of the American Airlines hub at the Los Angeles International Airport in Los Angeles California. First Officer Newcomb was first hired as a pilot by American Airlines on August 13, 1991.

24.     Plaintiff Michael O'Bryan is a United States citizen, residing in Oak Park, California and is an experienced airline pilot holding the rank of Group 4 First Officer. Plaintiff O'Bryan currently flies out of the American Airlines hub at the Los Angeles International Airport in Los Angeles California. First Officer O'Bryan was first hired as a pilot by American Airlines on January 16, 1992.

25.     Plaintiff Thomas O'Connor is a United States citizen, residing in Collierville, Tennessee and is an experienced airline pilot holding the rank of Group 4 First Officer. Plaintiff O'Connor currently flies out of the American Airlines hub at the Dallas/Fort Worth International Airport in Fort Worth, Texas. First Officer O'Connor was first hired as a pilot by American Airlines on May 17, 1999.

26.     Plaintiff William Payne is a United States citizen, residing in Arlington, Texas and is an experienced airline pilot holding the rank of Group 4 First Officer. Plaintiff Payne currently flies out of the American Airlines hub at the Dallas/Fort Worth International Airport in Fort Worth, Texas. First Officer Payne was first hired as a pilot by American Airlines on December 2, 1988.

27.     Plaintiff Michael Phelan is a United States citizen is an experienced airline pilot holding the rank of Group 4 First Officer. Plaintiff Phelan currently flies out of the American Airlines hub at the Los Angeles International Airport in Los Angeles, California. Plaintiff Phelan was first hired as a pilot by American Airlines on September 28, 1998.

28.     Plaintiff Cheryl Robles is a United States citizen, residing in League City, Texas and is an experienced airline pilot holding the rank of Group 2 First Officer. Plaintiff Robles currently flies out of the American Airlines hub at the Dallas/Fort Worth International Airport in Fort Worth, Texas. First Officer Robles was first hired as a pilot by American Airlines on March 12, 2001.

29.     Plaintiff Stephen Rogers is a United States citizen, residing in Fullerton, California and is an experienced airline pilot holding the rank of Group 2 First Officer. Plaintiff Rogers currently flies out of the American Airlines hub at the Los Angeles International Airport

9

in Los Angeles California. First Officer Rogers was first hired as a pilot by American Airlines on May 11, 2000.

30.     Plaintiff David Shaskan is a United States citizen, residing in Miami Beach, Florida and is an experienced airline pilot holding the rank of Group 3 First Officer. Plaintiff Shaskan currently flies out of the American Airlines hub at the Miami International Airport in Miami, Florida. First Officer Shaskan was first hired as a pilot by American Airlines on August 20, 2001.

31.     Plaintiff Whitney Sieben is a United States citizen, residing in Argyle, Texas and is an experienced airline pilot holding the rank of Group 3 First Officer. Plaintiff Sieben currently flies out of the American Airlines hub at the Dallas/Fort Worth Airport in Fort Worth, Texas. First Officer Sieben was first hired as a pilot by American Airlines on August 21, 2000. Following a furlough imposed by American Airlines before the merger with US Airwaysways, Plaintiff Sieben served in the United States military. Thereafter, Plaintiff Sieben was recalled to active service with American Airlines, accepted reinstatement, continued to serve in the military and promptly applied for, and was thereafter classified as being on, a Military Leave of Absence ("MLOA") by American Airlines until that military service concluded prior to December 13, 2013 when he again became actively employed as a pilot by American Airlines. Plaintiff Sieben was not permitted credit for time spent on military leave in the establishment of the Integrated Seniority List issued by the McCaskill-Bond Board of Arbitration on September 6, 2016.

32.     Plaintiff Gilberto Smith is a United States citizen, residing in Orlando, Florida and is an experienced airline pilot holding the rank of Group 2 First Officer. Plaintiff Smith currently flies out of the American Airlines hub at the Miami International Airport in Miami,

Florida.  First Officer Smith was first hired as a pilot by American Airlines on September 9, 1999.

33.     Plaintiff William Talley is a United States citizen, residing in West Chester, Pennsylvania and is an experienced airline pilot holding the rank of Group 2 Captain.  Plaintiff Talley currently flies out of the American Airlines New York hub which consists of John F. Kennedy International Airport, Laguardia Airport and Liberty International Airport.  Captain Talley was first hired as a pilot by American Airlines on May 3, 1991.

34.     Plaintiff Scott Torrence is a United States citizen, residing in Alvord, Texas and is an experienced airline pilot holding the rank of Group 4 First Officer.  Plaintiff currently flies out of the American Airlines hub at the Los Angeles International Airport in Los Angeles, California.  First Officer Torrence was first hired as a pilot by American Airlines on November 21, 1991.

35.     Plaintiff David Wexhler is a United States citizen, residing in Carlsbad, California and is an experienced airline pilot holding the rank of Group 2 Captain.  Plaintiff Wexhler currently flies out of the American Airlines hub at the Los Angeles International Airport in Los Angeles California.  Captain Wexhler was first hired as a pilot by American Airlines on November 7, 1990.

### The Defendants

36.     Defendant American Airlines is a corporate entity organized and existing under the laws of the State of Delaware, with a principal place of business in Fort Worth, Texas.

37.     Defendant American Airlines is  commercial carrier airline with national and international operations and is an "air carrier" within the meaning of both McCaskill-Bond and the RLA and is the world's largest airline when measured by fleet size, revenue and scheduled

11

passenger-miles flown and the second largest by number of destinations served. It averages nearly 6700 flights per day to nearly 350 destinations in more than 50 countries utilizing nearly 1000 airplanes.

38.     Defendant American Airlines operates out of nine national hubs located in or near Dallas, Charlotte, Chicago, Philadelphia, Miami, Phoenix, Washington, D.C., Los Angeles, and New York. It employs nearly 115,000 people and has a market valuation of over $40 billion.

39.     Defendant APA is an unincorporated association and was, at all times relevant hereto, the certified collective bargaining agent for the pilots employed by legacy American Airlines, including before the American Airlines/US Airwaysways merger on December 9, 2013, and is a labor union that has its principal place of business at Fort Worth, Texas.

## CLASS ACTION ALLEGATIONS

40.     The named Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure individually and on behalf of a proposed class of similarly situated pilots employed by American Airlines prior to the merger with US Airways consummated on December 9, 2013 (the "Legacy AA Pilots") who are currently employed, were subject to the Award and are rank on the ISL created by the Arbitration Board (the "proposed Class").

41.     The Proposed Class consists of nearly 10,000 member pilots and is so numerous that joinder of all of its members in a single action is impractical.

42.     The action presents questions of fact and law that are common to all members of the Proposed Class as follows:

(a)     The Proposed Class members are and have been commonly employed by American Airlines or placed on the American Airlines pilot seniority list at all times relevant to the allegations of wrongdoing by the Defendants contained in this Complaint;

12

(b)      The Proposed Class has been and is presently represented by the APA
pursuant to Certification granted by the National Mediation Board, thereby designating the APA
as the exclusive representative of the Proposed Class at all times applicable hereto before and
after the merger of American Airlines with US Airways for purposes of all matters related to the
employment of members of the Proposed Class; and

(c)      The agreements entered into between the APA and American Airlines
affects each member of the Proposed Class and all wrongful actions of the APA and American
Airlines related to the Award rendered by the Arbitration Board and the attached ISL were
directed at all members of the Proposed Class and affect their legal rights in the same or
substantially similar manner.   Moreover, the standing of the Plaintiffs to enjoy and protect the
duty of fair representation and McCaskill-Bond rights arise from their status as affected legacy
AA pilots and is, therefore, the same as that for any other putative LAA PFFI class member.

43.      The claims of the representative Plaintiffs are typical of the claims of the
Proposed Class. The individual representative Plaintiffs are pilots who obtained employment at
American Airlines prior to the effective merger date with US Airways, who have been and
continue to be represented by APA and whose terms and conditions of employment are governed
by the collective bargaining agreement between APA and AAL. The claims of all members of
the Proposed Class arose from the same events, from the same unitary course of conduct by APA
and American Airlines, and are based on the same legal and remedial theories.

44.      The named Plaintiffs will fairly and adequately represent the interests of the
Proposed Class in that: (i) they have moral and financial support from money raised through
contributions to a LLC established for that purpose made by hundreds of legacy American
Airlines pilots being disadvantaged by the disparities between the method by which seniority is

13

computed for Legacy American Airlines pilots as opposed to legacy US Airways pilots; a website and other forms of regular communication will permit the members of the class to monitor the progress of the lawsuit throughout its pendency and further permit input to counsel for the Proposed Class; (ii) one of more of the named Plaintiffs will suffer the kind of injuries that will be suffered by other members of the Proposed Class if the new Integrated Seniority List is implemented; and (iii) each named Plaintiff has a good understanding of the issues underlying this putative class action and has demonstrated a willingness to invest the necessary time and effort to fulfill his or her duties as a representative class member.

45.     Material questions of law and fact arising from this action are common to the named Plaintiffs and other members of the putative Proposed Class; these include the following:

(a)     whether the named Plaintiffs and members of the Proposed Class are entitled to injunctive relief to prevent the implementation of the new Integrated Seniority List that is not fair and equitable in violation of McCaskill-Bond;

(b)     whether the process by which the new Integrated Seniority List was determined deprived the Proposed Class members of fair representation; and

(c)     whether under the common benefit doctrine , the Defendants must pay Plaintiffs' reasonable litigation expenses , including all reasonable attorneys' fees and costs, that have been incurred enforcing the duty of fair representation.

46.     This action is best maintained as a Class Action because:

(a)     the prosecution of this case as a class action is superior to actions by individuals or groups of individuals because the prosecution of separate actions would create a risk of inconsistent or varying adjudications as to the duty of APA;

(b)     APA and Americab Airlines have acted in concert on grounds generally

14

applicable to the Proposed Class; and

        (c)    declaratory or injunctive relief as to the breach of duties alleged herein would apply to the members of the Proposed Class as a whole.

47.    All Proposed Class members have the right, under both McCaskill-Bond and the Railway Labor Act, to enforce the duty of fair union representation.

48.    All Proposed Class members have an interest in the APA adhering to its duty of fair representation by advocating on behalf of the interests of all Proposed Class members and presenting true and accurate information when advocating for a fair and equitable new Integrated Seniority List.

49.    Plaintiffs have retained counsel experienced in labor and employment law issues and class action litigation to prosecute these claims, satisfying the adequacy of representation requirement of Rule 23.

50.    The underlying facts, circumstances and issues of this action merit Rule 23 class action treatment and eventual certification because the factors enumerated herein satisfy the requirements of Rule 23(a) and Rule 23(b)(1)(A).

## JURISDICTION AND VENUE

51.    This case arises from a breach of the duties imposed on Defendants jointly by the provisions of McCaskill-Bond and the duty of fair representation in connection with the representation of employees in the airline industry under the Railway Labor Act. This Court has jurisdiction of this case under sections 1331 and 1337 of Title 28 of the United States Code.

52.    Venue is appropriate in this judicial district pursuant section 1391(b) of the Title 28 of the United States Code as Defendant American Airlines does business within this judicial

district and Defendant APA is engaged in the representation of employees within this judicial district.

## STATEMENT OF RELEVANT FACTS

53.     Evidentiary hearings were convened in accordance with the provisions of McCaskill-Bond before an appointed Arbitration Board on September 15, 2015 and concluded January 15, 2016 for the purpose of creating an integrated seniority list that would control all assignments and other work related matters relating to pilots employed by the new American Airlines formed by the merger of American Airlines and US Airwaysways.

54.     During that proceeding, all of the pilots employed by the merged airlines were represented by one of three committees and their separate legal counsel:

(a)     the American Airlines Pilots Integration Committee ("AAPSIC") representing all 9,845 legacy American Airlines pilots employed on the American Airlines seniority list on December 9, 2013;

(b)     the US East Pilots Seniority Integration Committee ("EPSIC") representing the 3,566 legacy US Airways pilots ("East pilots") employed by US Airways on December 9, 2013; or

(c)     the West Pilots Committee (the "West Committee") representing legacy America West pilots ("West pilots") employed by US Airwaysways on a separate seniority list from their East pilot counterparts.

55.     The  material facts set forth in the submissions to the arbitrators and elicited during the hearings established the following critical evidence which should have been a virtual map to a fair and equitable decision by the Arbitration Board:

16

## American Airlines

56.     The history of American Airlines begins, at least, to 1926, when Charles Lindbergh flew the U.S. Mail for Robertson Aircraft Corporation, which in 1930 was consolidated with other carriers into American Airways Corporation.

57.     In 1934, American Airways became officially named American Airlines which, in turn, evolved into a "legacy" airline with an extensive domestic and international route structure, numerous hubs, and a varied fleet of narrow-body, small wide-body and large wide-body aircraft.

58.     The pre-merger fully integrated seniority list of pilots employed at the pre-merger American Airlines was the product of at least four prior mergers and acquisitions resulting in the addition of pilots to the list: (a) American/TCA (1974) (all of whom have since retired); American/AirCal (1987); American/Reno Air (1999); and American/TWA (2001). Also included were pilots who joined the list from American Eagle, American Airlines regional affiliate.

59.     The pre-merger American Airlines seniority list is not arrayed in a linear fashion based on actual date-of-hire or adjusted length of service longevity. It is an amalgam of pilots placed on the list on a variety of bases.

60.     In the wake of the events of September 11, 2001, the entire airline industry, including American Airlines, experienced major entrenchments, and in 2003, American and, its collective bargaining representative, the APA, entered into an out-of-bankruptcy Restructuring Agreement, under which the carrier's pilots provided hundreds of millions of dollars in economic relief.

61.     The 2003 collective bargaining agreement between those parties provided for

17

periodic compensation increases, thereby permitting American Airlines pilots to experience

smaller pay reductions than their network airline counterparts during the 2002-2006 restructuring

period, and recouped more than half of their pay reductions by way of pay increases through

2008, preserved their defined benefit pension plan and enjoyed continuing benefits and beneficial

work rules when compared to their industry counterparts.

62.     By November 29, 2011, the American Airlines Pilots compensation was again at

industry standard levels when American's parent, AMR Corporation, filed for protection under

Chapter 11 of the federal Bankruptcy Code [In re AMR Corp., No. 11-15463 (SHL) (S.D.N.Y.)]

initiated out of a non-distressed strategy to accomplish the restructuring of American's finances.

63.     At the time American Airlines entered bankruptcy, it had a strong network of routes

and hubs, financial strengths, and numerous other competitive advantages, including more than $4

billion in cash assets obviating any need for debtor-in-possession financing.

64.     The larger goal of the AMR bankruptcy was to make structural changes that

competitors had achieved in the preceding decade which could not be accomplished outside of

bankruptcy.

65.     As a result of the foregoing, at the time American entered bankruptcy, and

thereafter, the American Pilots worked under industry-standard wages, benefits and working

conditions, operating a varied fleet based in multiple hubs, on an extensive domestic and

international route network. For instance, at the time of the merger, American Pilots were

assigned to the following major airport hubs in Washington, D.C., Boston, Dallas/Fort Worth,

Los Angeles, Miami, Chicago, San Francisco and Seattle, flying a great assortment of wide-body

and narrow-body aircraft.

66.     In fact, just months before the bankruptcy filing, American Airlines placed orders

18

and options for 26 new narrow- and wide-body aircraft which contemplated substantial growth and enhancement in American's fleet, supported by backstop financing that would not be affected by the bankruptcy.

## US Airwaysways

67.    US Airwaysways had its origins in the 1930s and 1940s in both All- American Airlines and Piedmont Airlines.

68.    In addition to pilots hired directly, the seniority list of legacy US Airwaysways (East) seniority list at the time of the merger with American Airlines on December 9, 2013 was also the product of prior mergers and acquisitions: (a) Allegheny/Lake Central (1968); (b) Allegheny/Mohawk (1972); (c) Piedmont/Empire (1985); (d) USAir/PSA (1986); (e) USAir/Piedmont (1987); and US Airways/Trump Shuttle (1997).

69.    As a result, the seniority list at US Airways (East) was an integrated list and not one linear (date-based).

70.    In 1998 and amendable January 2, 2003, the US Airways and its pilots negotiated a collective bargaining agreement, that only provided for identified pay raises that would become effective in the following years.

71.    However, following the industry recession following September 11, 2001, and in the face of growing financial losses, negative cash flow and weak liquidity, US Airwaysways filed for Chapter 11 bankruptcy on August 12, 2002 [In re US Airways, Inc., No. 2:14-cv-00007-RCM (E.D.Va.)], in the course of which the pilots, through their collective bargaining representative, the Sir Line Pilots Association ("ALPA"), entered into a series of restructuring agreements with $3.6 billion in aggregate contract concessions, including huge pay cuts and substantial losses in accrued benefits.

19

72.    While US Airways emerged from Chapter 11 bankruptcy on March 31, 2003, it continued to suffer ongoing losses and acute liquidity issues; was at risk of default on loan covenants, and sought a reduction in labor and other costs to combat low fare competition.

73.    US Airways filed for another Chapter 11 a second time on September 12, 2004 [In re US Airways, Inc., No. 04-13819-SSM (E.D.Va.)] and entered into a plan with the approval of the Court and the pilots' approvals, granting additional pay cuts and reductions of contributions to benefit plans, causing US Airways compensation to be the lowest among major airlines from 2004 through 2012.

74.    US Airwaysways was only able to emerge from the 2004 bankruptcy through its merger with America West.

### America West

75.    America West was founded in 1981 in Tempe, Arizona, and commenced operations in 1983 out of the Phoenix Sky Harbor airport.

76.    It too was forced to file for Chapter 11 protection in 1991, from which it exited in July 1994.

77.    During that time, in 1993, while in bankruptcy, ALPA became the America West Pilots' bargaining representative, which negotiated pay rates significantly below industry standard the original collective bargaining agreement was replaced by a new one effective December 30, 2003, permitting modest improvements in compensation and benefits.

78.    Prior to the merger with US Airways, America West was the second largest low-cost carrier in the United States and was operating a fleet of narrow-body and small wide-body aircraft providing domestic service out of Pheonix and Las Vegas, with additional service to Hawaii from Phoenix.

**The Turmoil Evolving From The Merger Of US Airwaysways and America West In 2005**

79.    In 2005, US Airwaysways merged with America West Airlines to form a single airline carrier called US Airwaysways.

80.    At the time of the merger, the US Airwaysways pilots ("East Pilots") and the America West pilots ("West Pilots") were both represented by the Air Line Pilots Association ("ALPA").

81.    Prior to the merger, the East and West Pilots each had their own separate seniority list and collective bargaining agreement.

82.    In September 2005, ALPA and the merging airlines entered into a Transition Agreement that set forth the process for achieving operational integration of the two airlines, including issues of pilot seniority.

83.    The Transition Agreement provided for the integration of the seniority lists in accordance with ALPA's Merger Policy, which required the two pilot groups to negotiate an integrated list and, if negotiation failed, to submit to binding arbitration. The Merger Policy stated that any award issued by an arbitration board "shall be final and binding on all parties to the arbitration and shall be defended by ALPA."

84.    The Transition Agreement also provided a timeline for implementing the single seniority list. Specifically, the Agreement stated that the seniority list would be implemented when three things occurred: (1) US Airwaysways obtained a single operating certificate (this occurred in 2007); (2) the two pilot groups created a single seniority list in accordance with the process set forth above; and (3) the pilots and the new airline negotiated a "Single Agreement"—a new collective bargaining agreement, applicable to all pilots. Until that happened, the existing

21

seniority lists and collective bargaining agreements for the respective sets of pilots remained in place.

85.    Finally, the parties agreed that the Transition Agreement could be modified by written agreement between ALPA and the airline.

86.    Consistent with the procedures set forth in the Transition Agreement, two merger committees, one representing the East Pilots and one representing the West Pilots, entered into negotiations over an integrated seniority list.

87.    Complicating the integration process, at the time negotiations were taking place, the East Pilots were a substantially larger group, consisting of about 5,100 pilots, as compared with 1,900 West Pilots. America West, however, was a newer and financially stronger airline; although its pilots generally had a later hire date, they also enjoyed slightly better wages. Most significantly, some 1,700 East Pilots (about one-third of all East Pilots) were on furlough at the time of the merger, while no West Pilots were on furlough.

88.    The East Pilots advocated a list based on "date of hire," while the West Pilots advocated a list based on the purported strength of their pre-merger airline. When these negotiations failed, the dispute went to binding arbitration.

89.    Negotiations, including mediation, failed to generate consensus over a single list, so pursuant to ALPA's Merger Policy, the parties proceeded to binding arbitration.

**The Nicolau Arbitration**

90.    An arbitration panel, led by George Nicolau, held hearings over the course of eighteen days, from December 2006 to February 2007.

91.    In May 2007, the arbitration panel issued a decision known as the "Nicolau Award" placing approximately 500 senior East Pilots at the top of the seniority list, explaining

22

that the West Pilots were not operating the widebody international aircraft generally flown by the most senior East Pilots at the time of the merger. It also placed at the bottom of the list the 1,700 East Pilots who were furloughed at the time of the merger, explaining that "merging active pilots with furloughees, despite the length of service of some of the latter, is not at all fair or equitable under any of the stated criteria." The Nicolau Award blended the remainder of the East Pilot list with the West Pilot list.

92.     The East Pilots filed suit to set aside the Nicolau Award.

93.     ALPA subsequently presented the Nicolau Award to the airline for acceptance, consistent with its obligation under the Transition Agreement to "use all reasonable means" to compel the airline to accept the arbitrated seniority list. US Airwaysways accepted the Award a few months later, in December 2007.

94.     In the meantime, dissatisfied with ALPA's commitment to the Nicolau Award and hoping to prevent the Award from ever going into effect, The East Pilots decided to leave ALPA and form a new union, USAPA.

95.     USAPA won the election and was certified as the collective bargaining representative for all pilots employed by US Airways in April 2008.

96.     In September 2008, five months after certification and almost a year *after* the airline accepted the Nicolau Award, USAPA then presented a new seniority proposal to US Airways which ignored the Nicolau Award and instead ordered the pilots according to their date of hire. USAPA's ordering system effectively forced the West Pilots to the bottom of the seniority list, leaving them vulnerable to any furloughs.

97.     As a result, he West Pilots sued USAPA in district court, alleging that USAPA breached its duty of fair representation by proposing a new seniority list instead of pursuing the

23

implementation of the Nicolau Award. After a trial, a jury found that USAPA had breached its duty by abandoning an arbitrated seniority list in favor of a date-of-hire list solely to benefit one group of pilots at the expense of another.

98.     The district court then held a bench trial on the remaining equitable issues holding that the terms of the Nicolau Award were final and binding, rejected the USAPA's position that its actions had a legitimate union purpose, entered judgment for the West Pilots, and ordered USAPA to negotiate in good faith for the implementation of the Nicolau Award.

99.     The East Pilots appealed and the United States Court of Appeals for the Second Circuit dismissed the case on ripeness grounds, concluding that the district court did not have jurisdiction to decide the case in the first instance.

100.    No agreement between USAPA and US Airways was ever reached on a unified collective bargaining agreement or an integrated seniority list prior to the merger between US Airways and American Airlines.

### The 2013 US Airwaysways/American Airlines Merger

101.    In April 2012, US Airwaysways announced its intention to pursue a merger with American Airlines, following a decision by American Airlines' parent company,

102.    Subsequently , US Airwaysways entered into discussions with the APA, then representing all American Airlines pilots and a Negotiating Advisory Committee appointed by the USAPA.

103.    Between late 2012 and early 2013, American Airlines, US Airwaysways, USAPA, and APA negotiated a multi-party agreement called the *Memorandum of Understanding Regarding Contingent Collective Bargaining Agreement* ("MOU") which set forth procedures for reaching a Merger Transition Agreement between APA and  the merged airline ("New

24

American"), as well as a Joint Collective Bargaining Agreement ("JCBA") to apply to all pilots employed by New American.

104.    Under the MOU, any prior collective bargaining agreements applicable to US Airways pilots and any *status quo* arising thereunder would be rendered a nullity once the merger was completed.

105.    The MOU contained significant economic benefits for all US Airways pilots (East and West), including enormous increases in pay and benefits.

106.    With respect to seniority integration, the MOU provided in Paragraph 10(h) that US Airways agreed that neither the MOU nor the [Joint Collective Bargaining Agreement] would provide a basis for changing the seniority lists currently in effect at US Airways other than through the process set forth in the McCaskill–Bond Amendment.

107.    In a vote solicited by the USAPA, US Airways were permitted to approve, and the majority of voting pilots working for US Airways did approve, the MOU.

108.    While at no time was the MOU submitted by the APA for ratification by the legacy pilots employed by American Airlines, the MOU was ratified by its execution on or about February 13, 2013 by signatories on behalf of the APA, the USAPA, American Airlines and US Airways.

109.    The merger and reorganization plan between American Airlines and US Airways became effective on December 9, 2013, triggering the MOU's provision mandating integration pursuant to the McCaskill–Bond Amendment.

110.    In accordance with the McCaskill–Bond process, the parties initially attempted to reach agreement through negotiations. When the parties did not reach a negotiated outcome by

the agreed-upon deadline, they initiated preparations for arbitration pursuant to Section 13(b) of the Allegheny–Mohawk LPPs.

111.   The McCaskill–Bond Amendment codified two of the labor-protective provisions that the Civil Aeronautics Board imposed in a 1972 merger between Allegheny Airlines and Mohawk Airlines. Sections 3 and 13 of those protective provisions are known as the "Allegheny–Mohawk LPPs":

(a)   Section 3 provided that employees involved in a merger of airlines will have their separate seniority lists combined into a single seniority list covering all employees in a **fair and equitable manner**. It further provided that if the parties cannot agree on a fair and equitable manner for combination of the seniority lists, any party may submit the dispute for resolution in accordance with the dispute resolution procedures of Section 13; and

(b)   Section 13(a) of the Allegheny–Mohawk LPPs established a resolution procedure for seniority integration disputes. If a dispute arises, and the parties have not settled the dispute within 20 days, Section 13 provided for a default process for selecting arbitrators and a 90–day timeline for resolving the dispute. Subsection (b) stated that the parties may agree on an alternative method for dispute settlement or arbitrator selection, but no party would be excused from compliance with the default procedure unless all the parties agreed on an alternative:

112.   On September 4, 2014, the two carriers (American Airlines and US Airways) and the unions (USAPA and the APA further agreed to the terms of a *Seniority Integration Protocol Agreement* ("Protocol Agreement") which, like the MOU, was intended to be consistent with McCaskill-Bond and the Allegheny/Mohawk LPPs.

26

113.   The Protocol Agreement together with the MOU established the procedural framework for seniority integration of pilots employed by the two airlines, including:

(a)   the establishment of only two Merger Committees, one each by the APA and the USAPA;

(b)   an exchange of pilot information and existing seniority lists;

(c)   the commencement of and established protocols for negotiations toward a single integration list;

(d)   a Preliminary Arbitration Board to handle disputes regarding the SLI arbitration process, including the request by the West pilots to have its own Committee;

(e)   setting the parties to the integration arbitration as the Merger Committees and American Airlines and allowing the APA and USAPA to be observers;

(f)   the issuance of a draft award to the parties for comments; and

(g)   full reimbursement by American for the expenses of the Committees without limitation individually or collectively.

114.   On September 16, 2014, the National Mediation Board, upon application of APA filed promptly after the merger date certified the APA as the sole collective bargaining agent for all three unintegrated pilot groups.

**The Established Disparities Among The Pilots Employed At The Time Of The Merger**

115.   At the time of the effective date of the merger, the merged carrier continued to operate the American Airlines and US Airwaysways systems separately in accordance with the provisions of the MOU.

116.   The use of separate seniority lists in providing assignments has not caused any difficulties to American Airlines in filling its routes or profitably operating its business.  To the

27

contrary, during the period from the effective date of the merger on December 9, 2013, American

Airlines has experienced record profits while capably working from the acceptable status quo of

the three separate seniority lists and associated operations, resulting in the circumstance that the

American Airlines pilots continued to operate purely legacy American Airlines aircraft, while the

US Airways operated on the basis of the two separate pilot divisions (East and West) flying its

fleet of airplanes.

117.    The proper guidance of establishing a fair and equitable seniority integration is

whether the career expectations of the separate groups of pilots at the time of the merger have

been fairly and adequately addressed.

118.    In the present instance, the evidence presented to the Arbitration Board, on every

relevant and significant metric, established that the legacy American Airlines pilots had

measurable career expectations superior to those of the East and West pilots prior to the merger

date:

(a)    American Airlines pilots worked in a network that provided superior work

opportunity, *i.e.* American Airlines' domestic and international route networks were larger and

the airline had more hubs and domiciles, each of which was stronger from a competitive

standpoint;

(b)    Those significantly stronger attributes made American Airlines the

significantly stronger carrier and provided greater work opportunities to its pilots;

(c)    American Airlines had superior fleet, fleet growth and enhancement

opportunities.  The fleet on hand at the time of the merger was larger in number and superior in

type, while the book of orders and options at hand were also superior to those of US Airways;

(d)    Due to the factors above, American was in far better competitive position,

28

unlike US Airways which was required to merge or fail.

(e)     Moreover, legacy American Airlines pilots enjoyed far greater
compensation and benefits, often two times that of their US Airways counterparts.  Specifically,
on December 9, 2013, the American pilots were receiving industry standard compensation
while the East and West pilots had no chance of reaching that level of compensation with a
standalone US AIrways.

119.     Immediately following the merger and without the required implementation of the
seniority integration, the East and West pilots then experienced immediate and dramatic
increases in their compensation and benefits.

120.     Accordingly, after the merger the relative positions of the three pilot groups had
already produced great benefit to the East and West pilots, while the post-merger rationalization
of the combined fleet and its needs was realized at the expense of the legacy American Airlines
pilots in the form of a less aggressive growth plan.

121     Simply stated, the East and West pilots have seen immediate benefit in the
merger, while the American pilots have experienced reduced career expectations.

**The Arbitration Process**

122.     Because following the certification of APA as the sole collective bargaining
representative of all pilots employed by the new American Airlines, the Defendants, unable to
reach an agreement on a newly constituted integrated seniority list or whether the West pilots
would be separately represented during the proceedings, the parties moved forward to institute
the required arbitration under the provisions of McCaskill-Bond.

123.     First on January 9, 2015, the Preliminary Arbitration Board appointed in
accordance with the Protocol concluded that APA had the discretion to designate a West Pilots

Merger Committee (the "West Committee") to participate in the SLI arbitration with AAPSIC and the US East Pilots Seniority Integration Committee ("EPSIC").

124.    However, at no time prior to the convening of the hearing before the Arbitration Board did the APA and American Airlines agree to first resolve the ongoing disagreements between the East Pilots and the West Pilots in an Arbitration proceeding in accordance with and mandated by McCaskill-Bond in a process preliminary to and separate from the resolution of an SLI between American Airlines and totality of the US Airways pilots.

## The Award

125.    On September 16, 2016, the Arbitration Board rendered its decision which by its terms was to be made in accordance with the mandate of fair and equitable integration in the McCaskill-Bond amendments to the Transportation Act, 45 U.S.C. § 42112 applying sections 3 and 13 of the Allegheny/Mohawk LLPs.

126.    Contrary to the facts presented during the nineteen (19) hearing days, the Arbitration Board made unfair and inequitable findings upon which it stated it relied in completing the ISL sealing the professional fates of the pilots then employed by the merged American Airlines and placed on the Arbitration Boards' ISL.

127.    Specifically, the Arbitration Board, *inter alia*:

(a)    Failed to properly recognize the career expectations of the legacy American Airline pilots relative to their US Airwaysways counterparts by employing an arbitrary and capricious and borrowed hybrid ISL modeling that was not relevant to the matter before them and employed the irrelevant factor of so called longevity, thereby greatly favoring the East and West pilots in their placement on the ISL;

30

(b)     Failed to disclose the technical basis of the computer generated ISL which it alleged was based upon its findings related to career expectations which, in turn, were erroneous, unfair and inequitable.  Contrary to the Board's averment in that regard, on information and belief, the Board merely employed the use of a "canned" program that was borrowed without appropriate modification from an unrelated  and grossly dissimilar prior seniority list integration in which one of the arbitrators had participated;

(c)     Failed to require the APA and American Airlines to first resolve the dispute between the East and the West pilots that had plagued US Airways and the courts for so many years;

(d)     Rejected completely any consideration of a properly updated calculation based on the Nicolau Award in employing an appropriate hybrid modeling in the integration of the East and West pilots as a a combined US Airways pilot force to the great detriment of the legacy American Airlines pilots in the subsequent integration;

(e)     Improperly ruled, contrary to the clear and indisputable evidence, that the long-term prospects of American Airlines was guarded at best and that it was disadvantaged in market competition with other merged airlines;

(f)     While holding that the East and West pilots experienced substantial immediate gains as a result of the merger, provided them with higher placement on the ISL based upon illusory and unfounded conclusions of retirement expectation and other irrelevant factors;

(g)     In the implementation of the improper longevity factor, disallowed furlough time for the American pilots while ruling that US Airways pilots on either the East or West seniority list would be treated on the basis of the earliest date of hire and not treated as furloughed pilots if they were flying at the time of the merger;

31

(h)     In considering any deduction for furlough time experienced by American pilots, failed to give any credit for time spent in military service in direct and unlawful violation of the employment and reemployment rights of members of the uniformed services of the United Stated under the provisions of USERA, 38 U.S.C. § 4311 *et seq.*;

(i)     Unlawfully, refusing to allow any participation by and consideration of the status of pilots removed from the American Airlines seniority list because of a disability, while providing disabled pilots on the US Airways list that protective right;  and

(j)     Failing to properly order the relative category and status of Group IV legacy American Airlines First Officers in resolving the issues necessary to the integrated rights of those first officers who had clearly equal to or higher benefits than lower group Captains employed by US Airways, thereby causing US Airways pilots who had never flown Group IV aircraft to enjoy higher seniority.

128.    As a direct result of the improper, unlawful, unfair and inequitable actions of the Arbitration Board in constructing the ISL, legacyAmerican Airlines pilots substantially regressed in career expectations in comparison to comparator East or West pilots, often losing considerable relative seniority (in some instances more than 50%) with accompanying losses in pay, benefits and pension rights as well as significant and irreparable loss in quality of life.

**COUNT I**
VIOLATION OF THE McCASKILL-BOND ACT, 49 U.S.C. §42112

129.    Plaintiffs repeat and reallege the allegations contained in the above paragraphs as if separately and fully set forth herein.

130.    McCaskill-Bond imposes a requirement of "fair and equitable" seniority integration on carriers.

32

131.    The McCaskill–Bond Amendment codified two of the labor-protective provisions that the Civil Aeronautics Board imposed in a 1972 merger between Allegheny Airlines and Mohawk Airlines. Sections 3 and 13 of those protective provisions are known as the Allegheny-Mohawk LPPs:

(a)    Section 3 provided that employees involved in a merger of airlines will have their separate seniority lists combined into a single seniority list covering all employees in a **fair and equitable manner**. It further provided that if the parties cannot agree on a fair and equitable manner for combination of the seniority lists, any party may submit the dispute for resolution in accordance with the dispute resolution procedures of Section 13; and

(b)    Section 13(a) of the Allegheny–Mohawk LPPs established a resolution procedure for seniority integration disputes. If a dispute arises, and the parties have not settled the dispute within 20 days, Section 13 provided for a default process for selecting arbitrators and a 90–day timeline for resolving the dispute. Subsection (b) stated that the parties may agree on an alternative method for dispute settlement or arbitrator selection, but no party would be excused from compliance with the default procedure unless all the parties agreed on an alternative.

132.    McCaskill-Bond was designed to provide protection provisions to employees assuring the unfair and inequitable injustices that were affected prior to its passage would not reoccur after its was the law and implicit in those protections is a private cause of action of any aggrieved pilot or group thereof to pursue an action in a federal court of appropriate venue.

133.    American Airlines, for its own selfish motives driven by the goal of increased profitability was, throughout the pre-merger and post-merger time period, complicit in the initiation and perpetuation of APA's improper and unlawful actions perpetrated against its own

33

members, with full awareness of APA's actions were egregiously improper, inadequate and unlawful in the context of its duty of fair representation of this members.

134.    The actions of the APA as aided and abetted by American Airlines prevented the establishment of an ISL that fair and equitable as required by the terms of McCaskill-Bond and therefore established clear violations of that Act.

135.    By not properly engaging in well-intentioned negotiation toward a resolution of first the East and West integration dispute and then the ultimate integration of all new American Airlines pilots, both the union and the employer violated the mandates of McCaskill-Bond to insure a fair and equitable integration of its pilot workforce to the great detriment of the legacy American pilots.

136.    Moreover, both the APA and American Airlines benefitted from the shared goal of affecting an ill-considered seniority integration process that would expedite post-merger operations and consolidate all of the post-merger pilots in a single fully-integrated seniority list with the opportunity to protect themselves either before or after the resolution of that list and assure that any group unfairly or inequitably harmed by those coordinated actions would be estopped from either delaying the integration or protesting its representatives actions.

137.    The provisions of McCaskill-Bond therefore provide for Plaintiffs' action against both their union and their employer for not providing  fair and equitable seniority integration after the merger with US Airwaysways.

## COUNT II
## VIOLATION OF THE DUTY OF FAIR REPRESENTATION

138.    Plaintiffs repeat and reallege the allegations contained in the above paragraphs as if separately and fully set forth herein.

34

139.    The duty of fair representation requires a union "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.

140.    While the fact that a union acted in a way that favored one group's interests over another is insufficient to show a breach of the duty, a breach of the statutory duty of fair representation does occur when a union's conduct toward a members of the collective bargaining unit is arbitrary, discriminatory, or in bad faith.

141.    The discrimination and bad faith analyses look to the subjective motivation of the union officials.

142.    An action breaches the union's duty if it undermines the integrity of the arbitral process and contributes to the erroneous outcome of the contractual proceedings.

143.    A union can only satisfy its fair representation duty in a post-merger seniority-integration dispute by establishing a fair *process* for determining seniority.

144.    In the present matter, however, well prior to the effective date of the merger, and solely in its own self-interest to swell its dues paying ranks and with the knowledge that it would petition to become the sole representative of large groups of pilots with widely divergent interests, the APA agreed to the terms of the MOU that it knew or should have known would have (and eventually did have) serious deleterious effects on the American Airline pilots it then alone represented.

145.    In further derogation of its obligations related to its premerger representation of the legacy American pilots, the APA egregiously rushed to assure its own place in the post-merger environment and took no steps to allow its premerger membership of legacy American Airlines pilots to review and suggest changes to the MOU that would prevent the anticipated

35

seniority integration to seriously and significantly impact their employment rights of fair and equitable treatment when a new integrated seniority agreement was established.

146.    If the premerger APA members had been permitted a review of the MOU and the opportunity to install changes that would not favor the East and West pilots in the anticipated integration, they would have been able to properly insist that the MOU be reformed so as not to prejudice their right to a fair and equitable integration result.

147.    Specifically, the MOU was approved by the APA without review or input by the premerger American pilot members of the union in a manner to favor the pilots employed by US Airways by, *inter alia*:

(a)    not compelling a resolution of the longstanding integration dispute between the US Airways East and West pilots;

(b)    negotiating the MOU from the foundation of the premerger 2012 collective bargaining agreement which represented modest improvements to the then current American Airlines pilots and disproportionately benefitted the East and West pilots who would upon the merger achieve wages and benefits far acceding any wages or benefits that they could not hope to achieve absent the merger without providing any assurances that those extraordinary advances to be enjoyed by the East and West pilots would not be properly offset during the anticipated seniority integration process so as to make that process fair and equitable to the American Airlines pilots they then represented;

(c)    not setting definitive standards in the MOU that would require American Airlines in any negotiation toward integration or any arbitration panel resolving the issue of seniority integration to fully and properly consider the superior career expectations of the pre-merger American pilots the union represented;

36

(d)    unlawfully not requiring furlough time spent in uniformed military service and on disability leaves to be ignored when configuring a fair and equitable integrated seniority list;

(e)    not setting standards to deal with the differing pre-merger measurements of seniority established at American Airlines and US Airways or the group classification issues to assure that the overwhelming advantage of American Airlines pilots in those areas would be protected; and

(f)    not establishing an open, non-confidential review of the arbitration award by the union members affected by any arbitration decision.

148.    The actions of the APA were equally egregious after the merger date of December 9, 2013 in that he Protocols, again entered into without approval of the legacy American pilots, had the same deficient terms as the MOU and greatly favored the East and West pilots regarding any resolution of seniority integration.

149.    If the MOU and the protocols had been properly constructed with the input of the American Airlines pilots who were effectively kept in the dark about the terms set forth in those documents, the post-merger seniority integration would not have been affected in a manner so clearly disproportionate of the rights and interests of the pre-merger APA members.

150.    The actions of the APA denied the pre-merger American pilots a fair process to resolve the superior seniority rights that they held and set rules that permitted the unfair and inequitable treatment of those rights.

151.    The actions of the APA, aided and abetted by the agreement and ratification of American Airlines for its own self-interest in expediting the integration process, were not

affected rationally to promote the aggregate welfare of the pre-merger pilots in the American

Airlines bargaining unit and were not motivated by any legitimate union purpose.

152. The concerted actions of the Defendants were outrageous and affected with

malice or with reckless indifference to the federally protected rights of the legacy American

Airline pilots.

153. The collective actions of the Defendants give rise to the award of punitive

damages against each of them.

## COUNT III
## COMMON BENEFIT ATTORNEYS' FEES

154. Plaintiffs repeat and reallege the allegations contained in the above paragraphs as

if separately and fully set forth herein.

155. Plaintiffs have brought this action to vindicate the rights of all legacy American

Airlines pilots to their rights under the McCaskill-Bond Act and their rights to fair representation

by their appointed collective bargaining representative.

156. By prevailing in this action, Plaintiffs will have conferred a substantial benefit on

all members of the putative class of legacy American Airlines member pilots.

157. Under the common benefit doctrine, the expenses of achieving those benefits

should, in all fairness, be spread among all class members who will have benefitted from such

efforts.

158. As such, the Plaintiffs are entitled to reimbursement for their reasonable

attorneys' fees, litigation expenses and costs incurred in bringing this action.

WHEREFORE, Plaintiffs named herein and those similarly situated, while reserving the

right to seek additional damages and plead additional causes of action as may become known or

available, demand judgment against Defendants to include the following:

38

A.      The issuance of a temporary restraining order and preliminary and permanent

injunctions entered in favor of Plaintiffs and against Defendants, enjoining Defendants from

implementing the new Integrated Seniority List on or before February 1, 2017;

B.      An award of compensatory and punitive damages, including awards to Plaintiffs

and all members of the putative class for losses in compensation, benefits and the loss of life's

pleasures in an amount not readily ascertainable at this time, the precise amount to be determined

after a full and fair hearing of the merits of Plaintiffs' claims at trial;

C.      Reasonable attorneys' fees, litigation expenses and costs incurred in bringing this

action; and

D.      Such other and further relief as this Court deems just and proper.


SPECTOR GADON & ROSEN, P.C.

By:      /s/ Alan B. Epstein
         Alan B. Epstein, Esquire (2346)
         Jared Solomon, Esquire (202835)
         Johan A. Ashrafzadeh-Kian, Esquire (314994)
         1635 Market Street, Seventh Floor
         Philadelphia, Pennsylvania 19103
         Telephone: (215) 241-8888
         Facsimile: (215) 241-8844
         aepstein@lawsgr.com
         jsolomon@lawsgr.com
         jkian@lawsgr.com

39