## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DAVID BAKOS, RICHARD BELL, ROBERT BENJAMIN, TERRY BROOKS, BRIAN CAMERON, DAVID COOPER, DAVID CROWE, GREG FINCH, PATRICK FOLEY, DEWEY GRAY, FRANCIS HEID, KELLI HUGHES, GLENN KYRK, MURRAY MUZZALL, MARK NEWCOMB, MICHAEL O'BRIEN, THOMAS O'CONNER, WILLIAM PAYNE, MICHAEL PHELAN, CHERYL ROBLES, STEPHEN ROGERS, DAVID SHASKAN, WHITNEY SIEBEN, GILBERTO SMITH, WILLIAM TALLY, SCOTT TORRENCE, and DAVID WEXLER Individually and on behalf of a class similarly situated American Airlines Pilots,** | **CIVIL ACTION** |
| **Plaintiffs,** | **NO. 17-402** |
| **v.** | |
| **AMERICAN AIRLINES, INC., and ALLIED PILOTS ASSOCIATION,** | |
| **Defendants.** | |

## <u>OPINION</u>

This case concerns pilot seniority integration, an intractable labor dilemma that follows the merger of two commercial airlines. Due to the paramount role of seniority in defining pilots' job conditions – including compensation, advancement opportunities, route assignments, and vulnerability to furlough – the integration process is fraught with career-defining ramifications for each pilot involved. What's more, integration is a zero-sum exercise; for each slot a pilot moves up, a colleague must move down. And several practical considerations prevent a simple

chronological ordering: differences in pre-merger pay and benefits, the relative health of the respective airlines, and the type of aircraft and routes flown by the pre-merged airlines. Negotiations are seldom up to the task, arbitration nearly always ensues, and pilots dissatisfied with the arbitral outcome routinely seek relief in court.

The pilot seniority integration following the merger between American Airlines and US Airways was no exception. The integration process began with more than a year of negotiation between two unions, two airlines, and three independent merger committees. Arbitration followed. And now Plaintiffs seek relief from this Court. They contend that the integrated seniority list produced by the arbitral panel was not "fair and equitable," and also that the process by which the entire integration process was arranged and conducted was not "fair and equitable," in violation of both the McCaskill-Bond Amendment to the Federal Aviation Act ("McCaskill-Bond"), 49 U.S.C. § 42112 note, and the duty of fair representation established by the Railway Labor Act, 45 U.S.C. § 151 *et seq.*[1] Defendants – American Airlines and Plaintiffs' union, the Allied Pilots Association ("APA") – have each filed a motion to dismiss Plaintiffs' claims. Those motions shall be granted.

I.      **BACKGROUND**

Given the unique legal and regulatory context of airline seniority integration, it is helpful to first set out a brief history of the principles implicated in this case before describing Plaintiffs' specific factual allegations.

A.      **History of Airline Seniority Integration Conflict**

Airline seniority integration was historically regulated by the Civil Aeronautics Board (CAB) as part its holistic review of proposed airline mergers. In 1950, the CAB first imposed

---

[1] Plaintiffs pled a third count seeking common benefits attorneys' fees based on their two substantive claims.

"labor protective provisions" (LPPs) on an airline merger to ensure that the employees of both pre-merger airlines were treated fairly. *United-Western, Acquisition of Air Carrier Prop.*, 11 C.A.B. 701, 709-10 (1950). Two years later, the Board devised the first iteration of what would become the standard seniority integration LPP when it mandated that seniority integration take place "on the basis of an agreement between the carrier and the representatives of the employees affected." *Braniff-Mid-Continent Merger Case*, 15 C.A.B. 708, 720 (1952). Later that year, faced with a merger in which one airline's workers were not unionized, the LPP was modified to require integration "in a fair and equitable manner," with an option for mandatory arbitration if negotiations were unsuccessful. *Delta-Chi. & S. Merger Case*, 16 C.A.B. 647, 660 (1952). After consistently applying this framework for 20 years, the CAB added an LPP providing for an optional default arbitration protocol during its oversight of the merger between Allegheny and Mohawk Airlines. *See Allegheny-Mohawk Merger Case*, 59 C.A.B. 19, 45, 49 (1972). Sections 3 and 13 of the LPPs articulated in that case, which became known as the "*Allegheny-Mohawk* LPPs," are relevant here. Section 3 provides that employees involved in a merger of airlines will have their separate seniority lists combined in a "fair and equitable manner," and that, if the parties cannot agree on a fair and equitable manner, any party may submit the dispute for binding arbitration as set forth in section 13.

Following the disestablishment of the CAB in 1985, there was no regulatory mechanism for enforcing the *Allegheny-Mohawk* LPPs, although they continued to appear as contractual provisions in collective bargaining agreements. Employees' recourse for an abrogation of the LPPs was to sue their union alleging a breach of the duty of fair representation.

The shortcoming of enforcing the LPPs through contract was exposed in 2001, when the union representing pilots for Trans World Airlines ("TWA") waived its members' *Allegheny-*

*Mohawk* protections in negotiations to merge with American Airlines. This caused TWA pilots to be placed on the integrated seniority list based on their date of initial employment with the merged airline (*i.e.*, below every pre-existing American Airlines pilot). In response, the two United States Senators from Missouri (where TWA was based) – James Talent and Christopher "Kit" Bond – attempted to codify the *Allegheny-Mohawk* LPPs into federal law. Their effort was initially unsuccessful, but in 2007 Senator Bond and Senator Claire McCaskill (who succeeded Senator Talent), secured the enactment of the McCaskill-Bond Amendment through which sections 3 and 13 of the CAB's labor protective provisions became statutory law. *See* Pub. L. 110-161, Division K, Title I § 117 (codified at 49 U.S.C. § 42112 note).

### B.     American-U.S. Airways Seniority Integration[2]

Although airline seniority integrations are always challenging, the American Airlines-US Airways merger announced in late 2012 presented uniquely difficult circumstances. As an initial complication, US Airways had not yet resolved its seniority integration following its 2005 merger with America West Airlines. Compl. ¶ 124. Moreover, American Airlines and US Airways pilots were represented by different unions, presenting a conflict over which union would be certified to represent the unified post-merger pilot group. Compl. ¶ 4. Finally, prior to the merger, American Airlines pilots enjoyed much higher compensation and benefits than their counterparts at US Airways, as well as more opportunities for international routes on larger aircraft. Compl. ¶ 118. More details regarding those difficulties follows.

---

[2] Defendant APA attached a pair of factual exhibits to its motion to dismiss, but the Court may look only to the Complaint, exhibits attached to the Complaint, matters of public record, and documents "integral to or explicitly relied upon in the Complaint" in evaluating a Rule 12(b)(6) motion to dismiss. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). The factual exhibits attached to APA's motion do not fall within these narrow constraints, so the Court shall not consider them at this juncture.

### 1. US Airways' Unresolved Seniority Integration

US Airways entered the merger with American Airlines plagued by the lingering seniority dispute following its merger with America West in 2005. Although one union – the Air Line Pilots Association ("ALPA") – represented both groups of pilots in the US Airways-America West merger, a negotiated seniority integration was not reached and the matter proceeded to arbitration. Compl. ¶¶ 82-89. The arbitration panel chaired by Gary Nicolau issued an award (the "Nicolau Award"), which was submitted to and approved by US Airways in late 2007. Compl. ¶¶ 90-93. Legacy US Airways pilots believed the Nicolau Award failed to protect their interests and defected from ALPA to form a new union – the US Airline Pilots Association ("USAPA") – which unseated ALPA as the certified bargaining representative for all US Airways pilots. Compl. ¶¶ 94-95. USAPA then blocked implementation of the Nicolau Award and promoted an alternative integrated seniority list. Compl. ¶ 96. Several years of litigation failed to resolve the dispute, and US Airways continued to operate with two seniority lists – the "East" pilots (pre-merger US Airways pilots) and the "West" pilots (former America West pilots) – all of whom were represented by USAPA. Compl. ¶¶ 97-100.

### 2. Negotiation of American-US Airways Seniority Integration Protocols

When American Airlines and US Airways announced their merger in 2012, American Airlines pilots were represented by the Allied Pilots Association ("APA"), while USAPA continued to represent US Airways pilots. Compl. ¶ 102. At the time, American Airlines pilots outnumbered US Airways pilots nearly two-to-one.[3]

---

[3] There were 9,845 legacy American Airlines pilots and 3,566 East pilots when the seniority integration occurred. Compl. ¶ 54. Although the Complaint does not state exactly how many pilots constituted the West group at the time, the West group was one-fourth the size of the East group when the US Airways-America West merger was completed. Compl. ¶ 87.

Shortly after the merger was announced, the two unions and the two airlines negotiated a Memorandum of Understanding (the "MOU") that set forth the procedures for combining the labor forces of the two airlines. Compl. ¶¶ 103, 147(b). The MOU was based on the 2012 collective bargaining agreement between American Airlines and APA, and provided that the US Airways pilots' pre-existing collective bargaining agreement would be nullified upon the completion of the merger. Compl. ¶¶ 104, 147(b). With respect to seniority integration, the MOU provided that the process would be conducted according to the requirements of the McCaskill-Bond Amendment. Compl. ¶ 104. USAPA provided the MOU to its members and solicited a vote; APA did not seek membership feedback but nonetheless approved the agreement. Compl. ¶¶ 107-08. The parties signed the MOU in February 2013 and it took effect on the date of the merger: December 9, 2013. Compl. ¶¶ 108-09.

In September 2014, the two airlines and the two unions signed a Seniority Integration Protocol Agreement ("Integration Protocol") which set the procedural framework for seniority integration of the pilots employed by the merging airlines. Compl. ¶ 112. It established two merger committees—one by APA and the other by USAPA – to oversee the seniority integration. Compl. ¶ 113(a). It also included a process governing negotiations towards an integrated list and set up a Preliminary Arbitration Board to resolve disputes that arose. Compl. ¶ 113(d).[4] In early 2015, the Preliminary Arbitration Board permitted the appointment of a third merger committee to represent the interests of the West pilots (as distinct from the East pilots, whose interests dominated the single committee originally established to represent all US Airways pilots). Compl. ¶ 123.

---

[4] Two weeks later, APA was certified as the sole collective bargaining unit for all pilots in the merged airline. Compl. ¶ 114.

### 3. Arbitration

The three Merger Committees, representing the legacy American Airlines pilots, the East pilots, and the West pilots, respectively, failed to reach a negotiated seniority list and the process moved to arbitration in September 2015. Compl. ¶ 122. In addition to the dispute that lingered between the East and West pilots over the Nicolau Award from the US Airways-America West merger, the arbitrators' task was complicated by the fact that American Airlines pilots enjoyed significantly higher pay and benefits prior to the merger, so US Airways pilots stood to receive a greater benefit from the merger itself, regardless of their placement on the seniority list. Compl. ¶¶ 118-21. American Airlines pilots, on the other hand, faced the prospect of stagnant or even diminished career prospects if placed beneath US Airways pilots with comparable years of experience. *Id.*

The three-member arbitration panel conducted 19 days of hearings between September 2015 and February 2016. Compl. ¶¶ 53, 126. In September 2016, the panel released a final Integrated Seniority List ("ISL") accompanied by a lengthy written opinion explaining its methodology for combining the three groups of pilots. Compl. ¶¶ 125-26. In reaching their decision, the panel considered several factors, including longevity, date of hire, the relative strength of the pre-merger airlines, and qualifications to operate certain routes and equipment. Compl. ¶ 127. Plaintiffs complain that this arbitration process was not fair and equitable as a result of the terms of both the MOU and Integration Protocol, and that American Airlines "aided and abetted" in the union's conduct by ratifying both of the agreements and the final ISL. Compl. ¶¶ 144, 151-53.

## II.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "In light of *Twombly*, it is no longer sufficient to allege mere elements of a cause of action; instead a complaint must allege facts suggestive of the proscribed conduct." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 177 (3d Cir. 2010) (internal quotation marks omitted).

Following the Supreme Court's rulings in *Twombly* and *Iqbal*, the Third Circuit requires a two-step analysis when reviewing a Rule 12(b)(6) motion. *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 219 (3d Cir. 2010). First, a court should separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). In doing so, the Court must construe the facts and draw all reasonable inferences in the light most favorable to the plaintiff. *Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284, 290 (3d Cir. 2014).

In the second step of the analysis, a court must determine whether the well-pled facts sufficiently show that the plaintiff "has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A plaintiff need not show that success on his or her claims is probable, but must assert "'enough facts to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element in a claim. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). However, "'[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678). At bottom, the question is not whether the

claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529-30 (2011) (internal quotation marks and citations omitted).

## III.    DISCUSSION

Plaintiffs' claims, which are lodged against both defendants – American Airlines and APA – proceed under both the McCaskill-Bond Amendment and the duty of fair representation. The duty of fair representation is well defined, so that claim shall be analyzed first, before examining whether the McCaskill-Bond Amendment offers a broader basis for challenging the results of seniority integration.

### A.    Duty of Fair Representation

"A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190 (1967).[5]  In addition to identifying arbitrary, discriminatory, or bad faith conduct, a plaintiff must also show "a direct nexus between breach of this duty and

---

[5] Defendants argue that Plaintiffs' duty of fair representation claim is barred by the six-month statute of limitations that applies to such claims. *See Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 304 (3d Cir. 2004).  Although Plaintiffs' claims are based on agreements signed more than six months prior to the filing of this case, the statute of limitations for a duty of fair representation claim does not begin to run until all "rays of hope" of a favorable negotiated or arbitrated resolution have been extinguished, so that union members are not placed "in the untenable position of antagonizing the union that continued to represent them in an effort to acquire the most advantageous seniority integration possible." *Id.* at 307-08.  In response to Plaintiffs' "rays of hope" argument, APA has pointed to *Addington v. US Airline Pilots Ass'n*, 791 F.3d 967, 980-81 (9th Cir. 2015), in which the Ninth Circuit held that the US Airways West pilots had a ripe duty of fair representation against their union as soon as the MOU (the same MOU at issue in this case) was signed.  *Addington*, however, concerned USAPA's agreement not to mandate implementation of the Nicolau Award – a bargaining position that had created a conflict between the West pilots and USAPA spanning "two mergers, numerous negotiations, an arbitration, eight years of litigation, three district court decisions, and now, two decisions in [the Ninth Circuit.]" *Id.* at 980.  Since the MOU ostensibly ended any chance that USAPA would advocate on behalf of the Nicolau Award, the Ninth Circuit held that the West pilots' claim against USAPA was ripe.  *Id.* In contrast, the alleged deficiencies in the MOU cited by Plaintiffs in this case explicitly left the door open for the arbitration panel to decide the issues favorably for Plaintiffs.  Thus, the "rays of hope" that Plaintiffs' concerns would be resolved through negotiation or arbitration were not extinguished until the arbitration order was issued on September 6, 2016 – less than six months before this case was filed.

resultant damages." *Deboles v. Trans World Airlines, Inc.*, 552 F.2d 1005, 1018 (3d Cir. 1977). In the context of arbitration, this causal nexus is met only when the breach "'seriously undermine[d] the integrity of the arbitral process'" such that it "'contributed to the erroneous outcome of the contractual proceeding.'" *Id.* (quoting *Hines v. Anchor Motor Freight*, 424 U.S. 554, 564 (1976)). Thus, when an arbitration is involved, "[a] duty of fair representation claim has two elements: (1) the union's conduct must have been arbitrary, discriminatory, or in bad faith; and (2) the union's conduct must have seriously undermined the arbitral process." *Ibbetson v. Teamsters Local 384*, No. 06-cv-3661, 2007 WL 3085851, at *2 (E.D. Pa. Oct. 22, 2007) (citing *Vaca*, 386 U.S. at 190; *Hines*, 424 U.S. at 567).

### 1.    Arbitrariness, Discrimination, and Bad Faith

Turning first to whether Plaintiffs have alleged arbitrary, discriminatory, or bad faith conduct by APA, a review of union performance "must be highly deferential" in view of the "the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." *Air Line Pilots Ass'n, Int'l v. O'Neill* ("*O'Neill I*"), 499 U.S. 65, 78 (1991). Thus, "a wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents," *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953), and the distinction "between honest, mistaken conduct, on the one hand, and deliberate and severely hostile and irrational treatment, on the other, needs strictly to be maintained." *Amalgamated Ass'n of St., Elec., Ry., & Motor Emps. of Am. v. Lockridge*, 403 U.S. 274, 301 (1971).

Plaintiffs' allegations of arbitrary, discriminatory, and bad faith conduct arise from their union's negotiation of the MOU and Integration Protocol. Plaintiffs have identified several issues which they contend APA should have resolved (in Plaintiffs' favor) at the MOU or Integration Protocol stage. First, they argue that the MOU should have mandated resolution of

10

the pre-existing conflict between the East and West US Airways pilots before integrating those

pilots with legacy American Airlines pilots.  Second, they contend that basing the MOU on the

2012 American Airlines collective bargaining agreement, which provided only "modest"

improvements, shortchanged the legacy American Airlines pilots in comparison to their US

Airways counterparts.  Third, they object that the MOU did not set definitive standards requiring

the integration process to "fully and properly consider the superior career expectations of the pre-

merger American pilots."  Fourth, they note that the MOU did not require furlough time spent in

military service or on disability to be ignored.  Fifth, they object to the MOU's failure to set

standards for reconciling the differing pre-merger measurements of seniority and group

classification between the pre-merger airlines.  Finally, they note that the MOU did not establish

an open, non-confidential review of the arbitration award by union members.  Plaintiffs claim

that the Integration Protocol repeated these same alleged deficiencies, and they argue that APA's

performance in negotiating these documents was tainted by a desire to curry favor with US

Airways pilots in hopes that those pilots would support APA as the union to represent the entire

post-merger pilot corps.   Compl. ¶ 147(a), (c)-(f).

In addition to the concerns they have identified with the content of the MOU and the

Integration Protocol, Plaintiffs argue that APA should have submitted each of the agreements to

its members for a vote, and that membership review and approval would have prevented the

shortcomings, ultimately paving the way for a more favorable seniority integration result.

Plaintiffs' claim can survive a motion to dismiss only if these factual allegations plausibly

describe arbitrary, discriminatory, or bad faith conduct that seriously undermined the arbitration.

### a.       Arbitrariness

Turning first to arbitrariness, a union breaches its duty of fair representation on this basis "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *O'Neill I*, 499 U.S. at 67 (internal citation omitted).  The fact that a union has "not negotiated the best agreement for its workers, however, [i]s insufficient to support a holding that the union's conduct was arbitrary." *Marquez v. Screen Actors Guild*, 525 U.S. 33, 46 (1998).  Rather, union conduct is arbitrary only "when it is without a rational basis or explanation."  *Id*.  In evaluating whether union performance was rational, the Supreme Court has admonished that "[t]he complete satisfaction of all who are represented is hardly to be expected," and, in particular, "[c]ompromises on a temporary basis, with a view to long range advantages, are natural incidents of negotiation."  *Ford Motor Co.*, 345 U.S. at 338 (1950).

Plaintiffs allege that two aspects of APA's performance were arbitrary:  (1) agreement to the substance of the MOU and Integration Protocol; and (2) the fact that APA did not seek membership review or approval of those agreements.

Plaintiffs have identified several alleged deficiencies in the MOU and Integration Protocol.  One of those alleged deficiencies was to base the MOU on the pre-existing collective bargaining agreement between APA and American Airlines.  But Plaintiffs have specifically asserted that American Airlines pilots' benefits and compensation were already at industry standards entering the merger under the pre-existing agreement.  Compl. ¶ 62. They have pled no facts to plausibly suggest that using an industry standard collective bargaining agreement as the basis for the MOU was "so far outside a wide range of reasonableness as to be irrational." *O'Neill I*, 499 U.S. at 67.

12

The remaining alleged deficiencies in the MOU and Integration Protocol consist of substantive or methodological issues that Plaintiffs contend should have been resolved definitively (and in their favor) at the negotiation stage, but were instead deferred to arbitration. Plaintiffs have not, however, identified any terms that affirmatively tied the arbitrators' hands to rule against them, nor have they alleged that the MOU or Integration Protocol imposed procedures that prevented Plaintiffs from being fully represented at the arbitration or from presenting evidence to the panel. Indeed, Plaintiffs acknowledge that they were represented before the panel in the same way as the other pilot groups – by an independent merger committee – and that the same evidence they have set forward in the Complaint in this case was presented to the arbitration panel. The allegation that these aspects of the MOU and Integration Protocol demonstrate arbitrary conduct is based on the premise that APA should have resolved several contentious issues favorably through negotiation, rather than submitting them to arbitration.

Deferring contentious issues to arbitration does not constitute arbitrary conduct in this context. Arbitration has been used to resolve airline seniority disputes for more than 60 years. Deferring to the traditional process for resolving the thorny issues involved in seniority integration – a process specifically provided for in current statute and previously enforced by the CAB – cannot plausibly be characterized as "so far outside a wide range of reasonableness as to be irrational." *See O'Neill I*, 499 U.S. at 67; *see also Gvozdenovic v. United Air Lines, Inc.* 933 F.2d 1100, 1107 (2d Cir. 1991) ("It cannot be said that the decision of United and the AFA to allow an arbitrator to determine the competitive rights of the appellants was arbitrary, discriminatory, in bad faith, or wholly outside a range of reasonableness. . . . Submission of the impending dispute to arbitration was an equitable and reasonable method of resolving it.").

Accordingly, the alleged shortcomings in the MOU and Integration Protocol do not reveal arbitrary conduct by APA.

Turning next to the allegation that it was arbitrary for the union to approve the MOU, Integration Protocol, or the final integrated seniority list without providing for membership review, Plaintiffs have failed to show that such a review was required. "The law does not require that a collective bargaining agreement be submitted to a local union or the union membership for authorization, negotiation or ratification" unless the agreement itself or the union's own rules require such a review or approval. *Confederated Indep. Union v. Rockwell-Standard Co.*, 465 F.2d 1137, 1140 (3d Cir. 1970); *see also Wiggins v. United Food and Commercial Workers Union, Local 56*, 303 F. App'x 131, 131 (3d Cir. 2008) (reaffirming the lack of a statutory right to vote on a contract extension). Plaintiffs have not alleged that the MOU, the Integration Protocol, or any other source of authority required APA to submit integration-related agreements to the membership for review or approval. In light of this legal context, Plaintiffs' allegations do not plausibly show that APA's approval of the agreements without membership review was irrational. In sum, neither the substance of the pre-arbitration agreements, nor the fact that these documents were ratified without a full membership review plausibly reveals the conduct "without a rational basis or explanation" so as to be arbitrary for duty of fair representation purposes.

### b. Discrimination

The anti-discrimination prong of the duty of fair representation prohibits "arbitrary distinctions between classes of employees within the appropriate unit which are not based on relevant differences between the employees or operations." *Deboles*, 552 F.2d at 1015. A breach occurs where any such distinctions are not only arbitrary, but also "invidious." *O'Neill I*,

499 U.S. at 81. In other words, a plaintiff must identify discrimination based on arbitrary factors which is "intentional, severe, and unrelated to legitimate union objectives." *Lockridge*, 403 U.S. at 301. In light of this standard, "a showing that union action has disadvantaged a group of members, without more, does not establish a breach of the duty of fair representation" given that "a union by necessity must differentiate among its members in a variety of contexts." *Flights Attendants in Reunion v. Am. Airlines*, 813 F.3d 468, 473 (2d Cir. 2016) (internal quotation marks omitted).

Plaintiffs allege two forms of discrimination. First, they contend that APA discriminated against its entire pre-existing membership by agreeing to an integration process that favored the US Airways pilots it hoped to recruit after the merger. Second, they argue that APA discriminated against some of its members on the basis of military service and disability.

Turning first to the "discrimination" against the entire union membership, this allegation fails to describe invidious conduct. Even if the union did place its current members at a disadvantage, there are no facts alleged to suggest that it did so out of intentional bias unrelated to legitimate union objectives. The allegation that the union prioritized the long-term strength of the entire future bargaining unit (which would include its pre-merger members) over short-term interests does not demonstrate a breach of its duty, since "[a] rational compromise on the initial allocation of the positions [is] not invidious 'discrimination' of the kind prohibited by the duty of fair representation." *O'Neill I*, 499 U.S. at 81.

Second, Plaintiffs' allegations concerning the treatment of military service and disability may fall within the legal purview of the discrimination prong, but the Complaint lacks any factual allegations attributing "intentional" or "severe" discrimination to the union itself. Instead, Plaintiffs have alleged only that the MOU did not require military and disabled pilots'

furlough time to be treated in a certain way.   The Complaint attributes the ultimate failure to accommodate these pilots to the arbitration panel, which was informed of Plaintiffs' disabled and military status by the merger committee.  Compl. ¶ 127(h).  Plaintiffs have therefore failed to plausibly allege that APA's representation of them constituted "intentional, severe," and "invidious" discrimination in violation of the duty of fair representation.

### c.     Bad Faith

A breach of the duty of fair representation claim based on bad faith requires both an improper motive for the union activity, and "substantial evidence of fraud, deceitful action or dishonest conduct."  *Lockridge*, 403 U.S. at 299 (internal quotation marks omitted).  For example, "a union has a duty not to deliberately misrepresent its bargaining efforts and positions in order to induce ratification of a collective bargaining agreement."  *Felice v. Sever*, 985 F.2d 1221, 1227 (3d Cir. 1993).  On the other hand, maintaining secrecy in negotiations that the union believed "necessary to conclude the deal" is not sufficient to show the level of "egregious" and "intentionally misleading" conduct required demonstrate a bad faith breach of the duty.  *O'Neill v. Airline Pilots Ass'n, Int'l* ("*O'Neill II*"), 939 F.2d 1199, 1203, 1206 (5th Cir. 1991).

Plaintiffs' bad faith argument is based on APA's failure to seek membership review or approval of the MOU and Integration Protocol.  But, as noted above, Plaintiffs have not pled any facts to show that the union was under any obligation to allow for such a review.  In such circumstances, "the mere failure to provide notice and an opportunity to be heard regarding the agreement, without more, does not amount to bad faith."  *White v. White Rose Food*, 237 F.3d 174, 183 (2d Cir. 2001).  In other words, without an obligation to provide for membership review, the failure to provide for the review does not provide evidence of intent to deceive or

defraud.  *Id.*  Since Plaintiffs have not identified any other allegedly deceitful, dishonest, or fraudulent actions, they have not plausibly pled bad faith conduct on the part of APA.[6]

## 2. Causation

In addition to failing to allege arbitrary, discriminatory, or bad faith conduct by APA, Plaintiffs have failed to show that the alleged deficiencies they have identified in the MOU and Integration Protocol "directly caus[ed] damage."  *Deboles*, 552 F.2d at 1019.  The causation standard for a duty of fair representation claim is stringent:  "Federal courts have consistently required a direct nexus between breach of this duty and resultant damages."  *Id.* at 1018.  As the Seventh Circuit recently put it, a plaintiff must show "that she was actually harmed by the union's actions, that is, she must demonstrate the outcome would probably have been different but for the union's activities."  *Rupcich v. United Food & Commercial Workers Int'l Union*, 833 F.3d 847, 854 (7th Cir. 2016) (internal quotation marks and modifications omitted).  In the context of arbitration, this means a showing that the union's activity "'seriously undermine[d] the integrity of the arbitral process.'"  *Deboles*, 552 F.2d at 1018 (quoting *Hines*, 424 U.S. at 564).

Plaintiffs' causal argument requires two inferences:  First, that different MOU or Integration Protocol terms would have improved Plaintiffs' standing on the final ISL, and second, that American Airlines and USAPA (representing the East and West pilots at the time the MOU and Integration Protocol were executed) would have agreed to those terms.  These inferences cannot be based on conclusory assertions; Plaintiffs must provide plausible factual support.  *See Iqbal*, 556 U.S. at 678.

---

[6] Plaintiffs cite *Bensel v. Allied Pilots Association*, 675 F. Supp. 2d 493 (D.N.J. 2009), for the proposition that a union acts in bad faith when it favors prospective members over current members in an effort to increase its membership.  But Plaintiff must first identify misleading conduct, which they have not, before the union's intent is relevant in evaluating a claim of bad faith.

The first causal inference – that different terms would have impacted the arbitral outcome – is logically warranted. Plaintiffs have suggested that the MOU or Integration Protocol should have included terms that would have mandated an arbitral process favorable to Plaintiffs on several key issues, although they do not indicate what specific terms should have been ratified. Since they have suggested, albeit vaguely, terms that would have dictated certain aspects of the arbitration, it follows that inclusion of those terms would have changed the outcome of the arbitration. But the logical soundness of this first inference cannot overcome the absence of any facts to support the second inference that American Airlines or USAPA would have accepted such terms. In fact, given that Plaintiffs' arguments were opposed by other parties during the arbitration and rejected by the arbitrators, the Complaint points toward the opposite inference: that integration terms more favorable to Plaintiffs would not have been agreeable. Since Plaintiffs have not pled facts to plausibly show that different MOU or Integration Protocol terms would have been possible through negotiation, Plaintiffs have failed to support the causation element of their duty of fair representation claim.

In sum, Plaintiffs have failed to plausibly describe a breach of the duty of fair representation, or to connect any alleged breach to their damages, so their duty of fair representation claim against APA shall be dismissed.

### 3.     American Airlines' Liability

Although Plaintiffs asserted their duty of fair representation claim against both APA and American Airlines, an employer does not owe a duty of fair representation to its employees. A union member may, however, combine a duty of fair representation claim "with a claim against his or her employer under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, for a breach of a collective-bargaining agreement, *i.e.*, a so-called 'hybrid' claim."

*Bullock v. Dressel*, 435 F.3d 294, 300 (3d Cir. 2006). Although Plaintiffs did not formally plead a section 301 "hybrid" claim, their inclusion of American Airlines in association with their duty of fair representation claims evinces a clear intent to state a such a claim against the airline, so the Court will construe the Complaint to include a hybrid claim against American Airlines for a breach of the collective bargaining agreement under section 301.

Plaintiffs' hybrid claim against American Airlines fails for two reasons. First, "[a] breach of the duty of fair representation is a necessary condition precedent to the § 301 claim." *Albright v. Virtue*, 273 F.3d 564, 576 (3d Cir. 2001) (internal quotation marks omitted). Here, where Plaintiffs' claim against APA for breach of the duty of fair representation will be dismissed, their claim against American Airlines must, accordingly, also be dismissed. Second, a section 301 claim associated with a duty of fair representation claim requires a showing that "the employer somehow acted improperly and infringed the rights of the individual aggrieved employees." *Am. Postal Workers Union, SFL-CIO, Headquarters Local 6885 v. Am. Postal Workers Union, AFL-CIO*, 665 F.2d 1096, 1109 (D.C. Cir. 1981). With respect to American Airlines, the Complaint includes only the assertion that the airline "aided and abetted" in APA's alleged wrongdoing by ratifying the MOU, the Integration Protocol, and the ISL. The fact that American Airlines ratified agreements presented to it by Plaintiffs' union does not demonstrate an infringement of Plaintiffs' rights by the airline, nor does it provide a basis for concluding that American Airlines conspired with APA to undermine Plaintiffs' interests. *See id.* (noting that there is no claim against an employer for merely engaging with a union that allegedly breached the duty of fair representation). Thus, even if the Complaint successfully alleged a breach of the duty of fair representation by APA, there is no plausible factual support for the companion claim against American Airlines, and this claim must be dismissed.

## B.    McCaskill-Bond Amendment

In addition to their duty of fair representation claim, Plaintiffs allege that the seniority integration was not conducted in a fair and equitable manner as required by the McCaskill-Bond Amendment and, in essence, ask the Court to conduct a review of the *substance* of the arbitration award.  Defendants' motions question whether McCaskill-Bond created a private right of action, and argue that even it if did, that cause of action is limited to ensuring that airline seniority integrations are carried out through a fair and equitable *process*.

Identifying an implied right of action in a federal statute requires examining "Congress's intent to create (1) a personal right, and (2) a private remedy." *Three Rivers Ctr. for Indep. Living v. Hous. Auth. of the City of Pittsburgh*, 382 F.3d 412, 421 (3d Cir. 2004).  This inquiry must be rooted in the language and structure of the statute itself; without evidence in the statutory text of congressional intent to create a private right enforceable through a private law suit, courts cannot create a claim "no matter how desirable that might be as a policy matter, or how compatible with the statute." *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001).

### 1.    Defining the Right

Determining what, if any, right was created by the McCaskill-Bond Amendment presents two questions:  First, does the statute contain "rights-creating language" indicating that its provisions are intended to create an individual right, as opposed to an agency mandate or some other indirect protection?  Second, if a personal right is created, what is the nature of that right?

### i.    Rights-Creating Language

For a federal statute to create a private right, the statute must include "rights-creating" language that focuses on the "individual protected" rather than "the person regulated." *Wisniewski v. Rodale, Inc.*, 510 F.3d 294, 301-02 (3d Cir. 2007).  For example, section 901(a) of

Title IX of the Education Amendments of 1972 ("Title IX") created a private right because the statute provides that "'No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" *Cannon v. Univ. of Chicago*, 441 U.S. 677, 681-82 (1979) (quoting Title IX, 20 U.S.C. § 1681). On the other hand, the Family Educational Rights and Privacy Act ("FERPA") does not create a private right because the language of the statute "speak[s] only to the Secretary of Education" and establishes the rules that the Secretary must apply in allocating funds. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002) (citing FERPA, 20 U.S.C. § 1232g(b)(1)).

McCaskill-Bond contains "rights-creating" language. The statute provides that sections 3 and 13 of the *Allegheny-Mohawk* LPPs "shall apply to the integration of covered employees." 49 U.S.C. § 42112 note. This language is directed at the protected employees themselves rather than to a regulatory agency or another third party charged with enforcing the protections. In fact, there is no regulatory agency tasked with enforcing the labor protections implemented by McCaskill-Bond because the CAB, which originally developed the standards, was disestablished 22 years before McCaskill-Bond was enacted. In light of the statutory language that explicitly acknowledges the CAB and describes protections for "covered employees," the text of McCaskill-Bond evinces Congress's intent to create a private right defined by sections 3 and 13 of the *Allegheny-Mohawk* LPPs.

## ii.     Nature of the Right

The text of McCaskill-Bond does not describe the protections it creates for workers, but instead directly incorporates sections 3 and 13 of the *Allegheny-Mohawk* LPPs into federal law. *See* 49 U.S.C. § 42112 note. In light of this structure, the substance of McCaskill-Bond can only

be discerned by an examination of the LPPs themselves.  Turning to the text of the CAB's

*Allegheny-Mohawk* decision, section 3 of the LPPs provides that when an airline merger impacts

employees' seniority rights, "provisions shall be made for the integration of seniority lists in a

fair and equitable manner, including, where applicable, agreement through collective bargaining

between the carriers and the representatives of the employees affected."  *Allegheny-Mohawk*

*Merger Case*, 59 C.A.B. 19, 45 (1972).  If negotiation is not successful, section 3 provides that

the dispute may be submitted by either party for arbitration under section 13.  *Id.*  Section 13 in

turn provides for arbitration procedures, and specifies that "[t]he decision of the arbitrator shall

be final and binding on the parties."  *Id.* at 49.[7]  Taken together, sections 3 and 13 mandate that

airline seniority integration take place in a "fair and equitable manner," and that, if negotiation

fails to yield an agreement, seniority be determined through "final and binding" arbitration.

On its face, section 3's "fair and equitable *manner*" requirement creates only a procedural

safeguard.  This straightforward interpretation is reinforced by the history of the LPPs, the

CAB's own enforcement of the LPPs, and federal judicial approval of that enforcement.  The

"fair and equitable manner" requirement was first devised as a substitute for union representation

to protect non-unionized employees.  *See Delta-Chi. & S. Merger Case*, 16 C.A.B. 647, 660

(1952).  The CAB subsequently enforced this protection for more than 30 years, in both

unionized and non-unionized settings, and in disputes that proceeded to arbitration, "repeatedly

ma[king] clear that it considered its authority limited to deciding whether the arbitration had

been conducted 'in a fair and equitable *manner*,' *i.e.*, as a procedural matter, rather than whether

the terms of the award were substantively equitable."  *Cook v. Pan Am. World Airways*, 771 F.2d

---

[7] Section 13(a) provides for default arbitration procedures, while section 13(b) allows for parties to agree on
negotiated arbitration protocols.  *Allegheny-Mohawk*, 59 C.A.B. at 49.

635, 642 (2d Cir. 1985) (internal citations omitted); s*ee also Nat'l Airlines Acquisition*, 95

C.A.B. 584, 585 (1982) (noting that the CAB's review of seniority arbitration "is confined to

examining whether the arbitration was fairly and equitably conducted"); *Pan Am-TWA Route*

*Exchange*, 85 C.A.B. 2537, 2540 (1980) ("We will not . . . review the merits of a challenged

award, the merits including questions of law and questions of fact.").  In conducting this review,

the CAB "focused its attention on the procedures used by the parties to negotiate the seniority

integration issue, to arrive at terms for arbitration of the issue when the negotiation failed, and to

assure fair representation of union members in the arbitration itself."  *Cook*, 771 F.2d at 642.  In

light of the origin of the LPPs and agency and judicial interpretation of them, I conclude that the

CAB's authority under sections 3 and 13 of the *Allegheny-Mohawk* LPPs concerned only

ensuring that airline seniority integration, including arbitration, is conducted through a fair and

equitable process.

With the clear limits of the CAB's enforcement of the *Allegheny-Mohawk* LPPs in mind,

the inquiry turns to whether Congress intended McCaskill-Bond to create a broader right than the

procedural protections imposed by the CAB.  There is nothing in the language of McCaskill-

Bond to suggest such an intent.[8]   Instead, the structure of the statute – explicitly incorporating

the LPPs from the *Allegheny-Mohawk* decision without caveats or supplemental language –

indicates an intent to codify nothing more than the procedural protections that were enforced by

---

[8] Plaintiffs argue that because the parties chose to construct their own arbitration protocols, pursuant to section 13(b) of the LPPs, rather than to use the default protocols set forth in section 13(a), the "fair and equitable manner" provision in section 3 must include a substantive review of the ISL itself.  But nothing in the text of the *Allegheny-Mohawk* decision or McCaskill-Bond, nor any other legal authority, supports this contention that electing bespoke arbitration protocols under section 13(b) converts the "fair and equitable *manner*" requirement in section 3 into a substantive review.

the CAB for more than 30 years.[9]  Therefore, as both the Second and Seventh Circuits have

noted, the "'basic rule'" of McCaskill-Bond is to codify the *Allegheny-Mohawk* requirement that

an airline implement a process for "'merging the seniority lists, rather than putting employees of

the acquired carrier at the bottom of the acquiring carrier's list.'"  *Flight Attendants in Reunion*,

813 F.3d at 473 (quoting *Comm. of Concerned Midwest Flight Attendants for Fair and Equitable

Seniority Integration v. Int'l Bhd. of Teamsters Airline Div.*, 662 F.3d 954, 957 (7th Cir. 2011)).

Turning next to what process is required under section 3's "fair and equitable manner"

standard, the CAB's historical enforcement of the LPPs again provides an answer.  Under

sections 3 and 13, "an employee is bound by the resolution of seniority and other disputes by his

authorized bargaining representative in negotiations or binding arbitration, unless the employee

can show that the resolution was tainted by the union's breach of its duty of fair representation.*"

Nat'l Airlines Arbitration*, 95 C.A.B. 584, 586 (1982).  This standard is consistent with the origin

of the "fair and equitable manner" requirement: to protect non-unionized employees in seniority

integrations following a merger with a unionized airline.  *See Delta-Chi. & S.*, 16 C.A.B. at 660

(1952).  Thus, in the context of unionized employees, the "fair and equitable manner"

requirement of section 3 is satisfied by good faith union representation, and the task for the CAB

under section 3 was "to determine whether the unions involved have fairly represented their

members in the negotiations and ensuing arbitration proceedings."  *Cook*, 771 F.2d at 645.

---

[9] Plaintiffs have pointed to several recent arbitrations decisions arising from other mergers to suggest a substantive
component to the *Allegheny-Mohawk* / McCaskill-Bond "fair and equitable" standard.   But these decisions merely
reveal what given arbitration panels believed was necessary to comply with the principles of fairness and
equitableness.  Furthermore, even if these decisions purported to describe the standard applied by courts (or the
CAB) in enforcing the "fair and equitable manner" requirement – which they do not – the analysis of arbitration
panels in disputes unrelated to the matter before this Court would not outweigh the clear and consistent
interpretation of the *Allegheny-Mohawk* LPPs set forth by the CAB and interpreted by federal courts.

The text of McCaskill-Bond reveals no evidence of congressional intent to create broader protections than those imposed by the CAB's enforcement of the *Allegheny-Mohawk* LPPs.  As noted above, McCaskill-Bond directly incorporates sections 3 and 13 of the LPPs into federal law with no modification.  Therefore, under McCaskill-Bond, as under the CAB's enforcement of the *Allegheny-Mohawk* LPPs, the requirement that seniority integration take place in a "fair and equitable manner" is satisfied if the employees have good faith representation during the integration process.  Thus, the question presented by a McCaskill-Bond claim brought by unionized employees, is whether the union violated its duty of fair representation.

As discussed above, Plaintiffs have failed to plead facts that plausibly state a claim for a sbreach of the duty of fair representation.  They have therefore also failed to plausibly show a violation of the right created by McCaskill-Bond, and it is unnecessary to determine if McCaskill-Bond creates a cause of action to remedy violations of the right it creates.  Plaintiffs' McCaskill-Bond claim shall be dismissed.[10]

## C.    Dismissal With Prejudice

Although Plaintiffs have not sought leave to amend their Complaint, the Third Circuit has "instructed that if a complaint is vulnerable to [Rule] 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).  In this case, amendment would be futile.  The integrated seniority list at issue was developed by a neutral arbitration panel before which

---

[10] The numerous allegations in the Complaint concerning the substance of the arbitration panel's decision do not fall within the purview of the *Allegheny-Mohawk* LPPs, and therefore also fall outside the scope of McCaskill-Bond.  However, the limitation of the *Allegheny-Mohawk* LPPs to procedural concerns surrounding the seniority integration process did not disturb a party's right to seek review of the arbitration award under other statutes, *see Allegheny-Mohawk*, 59 C.A.B. at 33 n.28, and it follows that McCaskill-Bond likewise does not prevent a challenge to an arbitration award through other means.  If, how, and where Plaintiffs could seek a substantive review of the ISL issued by the arbitration panel is not a question before the Court, however, beyond the holding that McCaskill-Bond does not provide basis for such a review.

Plaintiffs had independent representation by a dedicated merger committee.  Compl. ¶54(a).  The panel received the same material facts regarding seniority integration facts that Plaintiffs have pled in this Court.  Compl. ¶ 55.  Even if Plaintiffs could revise their Complaint to show arbitrary, discriminatory, or bad faith conduct by the union, the basic structure of the integration process at issue presents a barrier to showing that the union's conduct "seriously undermined the integrity" of the arbitration, as required to make out a duty of fair representation claim.  *See Deboles*, 552 F.2d at 1018.  Since demonstrating a breach of the duty of fair representation is required for both the duty of fair representation claim itself and also to show a violation of the right created by McCaskill-Bond, amendment of Plaintiffs' Complaint would be futile and their claims shall be dismissed with prejudice.[11]

An order follows.

**Dated**:  June 26, 2017

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**

_____

**WENDY BEETLESTONE, J.**

---

[11] Plaintiffs' Third Count – a separate claim for common benefit fees – is derived from their two substantive claims, and shall also be dismissed with prejudice.